1  Mark L. Block (SBN 115457)
   mblock@wargofrench.com
2  Jeffrey N. Williams (SBN 274008)
   jwilliams@wargofrench.com
3  WARGO & FRENCH LLP
   1888 Century Park East, Suite 1520
4  Los Angeles, CA  90067
   Telephone: 310-853-6300
5  Facsimile: 310-853-3333

6  Attorneys for Defendants
   JPMorgan Chase Bank, N.A., as acquirer (*erroneously sued as "JP Morgan Chase*
7  *Bank, National Association"*); JPMorgan Chase and Company (*erroneously sued as*
   *"JP Morgan Chase and Company"*); JPMorgan Securities, LLC (*erroneously sued*
8  *as "JP Morgan Securities, LLC"*); EMC Mortgage LLC; and The Bear Stearns
   Companies, LLC

9

10            IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
11                       SOUTHERN DIVISON

12
   ILEANA SPIZZIRRI                    Case No.  SACV12-00311 JVS
13                                     (RNBx)
        Plaintiff,
14                                     **DEFENDANTS' NOTICE OF
             v.                        MOTION AND MOTION TO
15                                     DISMISS THIRD AMENDED
   JP MORGAN CHASE BANK,               COMPLAINT PURSUANT TO
16  NATIONAL ASSOCIATION; JP            FRCP 12B(6); MEMORANDUM
   MORGAN CHASE AND COMPANY; JP        OF POINTS AND AUTHORITIES**
17  MORGAN SECURITIES, LLC; EMC
   MORTGAGE, LLC; THE BEAR             Date:   October 1, 2012
18  STEARNS COMPANIES, LLC.            Time:   1:30 p.m.
                                       Courtroom: 10C
19           Defendants.
                                       [Request for Judicial Notice filed July 6,
20                                     2012]

21                                     Third Amended Complaint Filed:   July
                                       27, 2012
22
                                       Hon. James V. Selna
23

24  //

25  //

26  //

27  //

28

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

---

DEFS' NOT. OF MOTION & MOTION TO DISMISS THIRD AMENDED COMPLAINT

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

**TO THE COURT AND TO ALL PARTIES HEREIN:**

PLEASE TAKE NOTICE that on October 1, 2012 at 1:30 p.m. in Courtroom 10C of the above-captioned Court, located at 411 West Fourth Street, Santa Ana, California 92701, Defendants JPMorgan Chase Bank, N.A. (erroneously sued as "JP Morgan Chase Bank, National Association"); JPMorgan Chase and Company (erroneously sued as "JP Morgan Chase and Company"); JPMorgan Securities, LLC (erroneously sued as "JP Morgan Securities, LLC") (collectively, "Chase"); EMC Mortgage LLC ("EMC"); and The Bear Stearns Companies, LLC ("Bear Stearns" and together with EMC and Chase, the "Chase Defendants") will, and hereby do, move the Court for an Order dismissing Plaintiff Ileana Spizzirri's ("Plaintiff") Third Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted, on the grounds that Plaintiff has failed to plead the essential facts necessary to assert her claims, the claims are barred on their face and/or as a result of evidence that may properly be judicially noticed by the Court.

This Motion is made following the conference of Counsel for the Chase Defendants and Plaintiff pursuant to L.R. 7-3, which took place on August 21, 2012.

//
//
//
//
//
//
//
//
//
//

1

2       This Motion is based upon this Notice of Motion and Motion to Dismiss, the

3 Memorandum of Points and Authorities attached hereto, the Request for Judicial

4 Notice filed in this action on July 6, 2012, the complete file and record in this action,

5 and such further and other matters as the Court may allow.

6

7 Dated:  August 30, 2012                  WARGO & FRENCH LLP

8

9                                By: */s/ Jeff Williams*

10                                    Mark L. Block
                                   Jeffrey N. Williams

11

12                                  Attorneys for Defendants

13                                  JPMorgan Chase Bank, N.A.
                                 (*erroneously sued as "JP Morgan*

14                                  *Chase Bank, National Association")*;
                                 JPMorgan Chase and Company

15                                  (*erroneously sued as "JP Morgan*
                                 *Chase and Company"*); JPMorgan

16                                  Securities, LLC (*erroneously sued as*
                                 *"JP Morgan Securities, LLC"*); EMC

17                                  Mortgage LLC; and The Bear Stearns
                                 Companies, LLC

18

19

20

21

22

23

24

25

26

27

28

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

DEFS' NOT. OF MOTION & MOTION TO DISMISS THIRD AMENDED COMPLAINT

# Table of Contents

**Page No.**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................. 2

III.    LEGAL STANDARD ........................................................................................ 4

IV.     ARGUMENT ..................................................................................................... 5

    A.   Plaintiff's TAC Fails in its Entirety Because the Claims Are Barred by the
        Applicable Statute of Limitations ................................................................. 5

    B.   Plaintiff's Concealment And Negligence Claims Fail Because Defendants Did
        Not Owe Plaintiff a Duty to Disclose, and Plaintiff Cannot Plead The
        Requisite Elements of These Claims ............................................................. 7

    C.   Plaintiff's Unfair Business Competition Claim Fails for Lack of a Predicate
        Wrongful Act by Defendants and Because Plaintiff Lacks Standing .................. 12

V.      CONCLUSION ................................................................................................ 15

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

-i-

DEFS' NOT. OF MOTION & MOTION TO DISMISS THIRD AMENDED COMPLAINT

# Table of Authorities

**Page**

**Cases**

*Akhavein v. Argent Mortgage Co.*, No. 5:09-cv-00634 RMW (RS), 2009 WL
    2157522 (N.D. Cal. July 18, 2009) ............................................................. 5

*Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226 (1995) ........................... 11

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) ......................................................... 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................. 5

*Cel-Tech Commc'ns v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163 (1999). ........... 14

*Fortaleza v. PNC Fin. Servs. Group, Inc.*, 642 F. Supp. 2d 1012 (N.D. Cal. 2009) .... 14

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) ............................................. 13

*Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612 (1993) .................. 14

*Ladd v. County of San Mateo*, 12 Cal. 4th 913 (1996) ..................................... 8

*Lazar v. Super. Ct.*, 12 Cal. 4th 631 (1996) ................................................... 11

*Meyer v. Ameriquest Mortgage Co.*, 342 F.3d 899 (9th Cir. 2003) ................... 6

*Nymark v. Heart Fed. Sav. & Loan Ass'n*, 231 Cal. App. 3d 1089 (1991) ........ 8, 9

*Oaks Mgmt. Corp. v. Super. Ct.*, 145 Cal. App. 4th 453 (2006) ....................... 8

*Puentes v. Wells Fargo Home Mortg., Inc.*, 160 Cal. App. 4th 638 (2008) ........ 13

*Resnick v. Hayes*, 213 F.3d 443 (9th Cir. 2000) .............................................. 4

*Roswell Capital Partners LLC v. Alternative Const. Technologies*, 638 F. Supp. 2d
    360 (S.D.N.Y. 2009) ................................................................................ 8

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

*Scripps Clinic v. Super. Ct.*, 108 Cal. App. 4th 917 (2003) ........................................... 14

*Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700 (2001) ........................ 14


**Statutes**

Cal. Bus. & Prof. Code § 17200 .................................................................................. 13

Cal. Code Civ. Proc. § 338(d); ...................................................................................... 5

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

DEFS' NOT. OF MOTION & MOTION TO DISMISS THIRD AMENDED COMPLAINT

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff's Third Amended Complaint (the "TAC"), like her Second Amended Complaint ("SAC"), was filed as an unabashed attempt to recover from an unfavorable – but entirely voluntary – investment.[1]  Specifically, in May 2006, Plaintiff purchased the subject real property located at 2149 Via Aguila, San Clemente, California 92673 (the "Property") with the proceeds from a home loan transaction with Bear Stearns Residential Mortgage Corporation ("BSRM").[2]  Over the years, the value of the Property declined.   Plaintiff filed this lawsuit in 2012 in an attempt to recover the equity she purportedly lost in her investment.

While Plaintiff's 156-page TAC asserts three separate causes of action against Defendants, each claim is premised on the contention that BSRM purportedly defrauded Plaintiff by inflating the value of the Property through an independent appraisal conducted in conjunction with the origination of the loan, an appraisal which Plaintiff admits was conducted for the benefit of BSRM.  Plaintiff alleges that prior to her purchase of the Property, BSRM intentionally concealed material facts regarding potentially negative residential market conditions and the risky nature of securitized loans from an appraiser.  As a result, Plaintiff alleges she was induced into purchasing the Property on the false belief that the underlying value of the Property was $1,100,000.  Notably, Plaintiff has wholly failed to allege that the value of the property at the time was below $1,100,000.

Based on this faulty allegation, Plaintiff has asserted claims for: (1) fraudulent concealment and nondisclosure; (2) violation of California's Unfair Competition Law;

---

[1] Pursuant to the Court's Initial Order Following Filing of Complaint Assigned to Judge Selna, Paragraph J, a copy of Plaintiff's TAC is attached to this Motion as **Exhibit A**.

[2] BSRM, the original lender, is not named as a defendant in this lawsuit.  BSRM is a subsidiary of Defendant Bear Stearns.

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

and (3) negligence. However, Plaintiff's TAC fails because all the claims are barred by the applicable statute of limitations. Moreover, Plaintiff's allegations of fraud and negligence, based on Defendants' alleged failure to disclose that the Property's value could be affected by negative market conditions or the potential securitization of the subject loans, fail because the Defendants (who were not present at loan origination) had no duty to disclose this information to Plaintiff. In fact, as a lender in an arms-length loan transaction, BSRM pursued its own economic interests and appraised the Property for its own determination of whether Plaintiff qualified for the loans. Plaintiff was not entitled to rely on BSRM's appraisal and qualification process (not disclosed to Plaintiff) because such actions are admittedly intended to benefit the lender, not the borrower.

Furthermore, Plaintiff lacks standing to assert a claim for violation of unfair competition laws, and in any event, her claim fails to allege any particular wrongdoing by Defendants and, notably, Plaintiff's lengthy TAC chose to focus on mortgage lending practices on a national scale more so than those of BSRM. Plaintiff has not asserted and indeed cannot assert that securitization of the subject loan is improper in any way. Rather, Plaintiff relies entirely on the other meritless causes of action described in the TAC. The Defendants thus ask the Court to enter an order dismissing Plaintiff's TAC with prejudice pursuant to FED. R. CIV. P. 12(b)(6).

## II.   **STATEMENT OF FACTS**

In mid-April of 2006, Plaintiff applied for a home loan with BSRM. (TAC ¶ 203.) In conjunction with Plaintiff's loan application, BSRM obtained an independent appraisal of the Property "conducted for the purpose of determining the adequacy and sufficiency of the underlying collateral to support" the subject loans (the "Appraisal"). (Id. ¶ 21.) The result of the appraisal was that the Property "appraised for the full amount of the purchase price." (Id. ¶ 37.) While the purchase and sale agreement between Plaintiff and the seller contained an appraisal contingency, "requir[ing] that the underlying property [] appraise for the purchase price." (Id. ¶ 199.) Plaintiff

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

1   unilaterally (without any representation from BSRM) elected to waive the appraisal

2   contingency in the purchase and sale agreement based on the appraisal conducted for

3   the benefit of BSRM.  (*Id.* ¶ 39(G).)  Then on May 6, 2006, Plaintiff obtained a loan

4   for $880,000 (the "Loan") from BSRM to purchase the Property.  (Request for Judicial

5   Notice filed in this action on July 6, 2012 ("RJN"), Ex. A.)  Plaintiff concurrently

6   obtained another loan for $110,000 from BSRM (the "Junior Loan," and together with

7   the Loan, the "Loans") secured by the Property.  (RJN, Ex. B.)  EMC was the servicer

8   of the Loans.  (TAC ¶ 45.)  EMC then transferred the servicing rights to the Loans to

9   Chase.  (TAC ¶ 8.)[3]

10      Although no non-judicial foreclosure proceedings have commenced against the

11  Property, Plaintiff initiated the instant action against Defendants.  In the face of

12  Defendants' prior Motion to Dismiss (Dkt. Ent. 16), Plaintiff amended her Complaint

13  for the third time.  (Dkt. Ent. 21.)  However, Plaintiff's lengthy, rambling TAC

14  generally re-alleges the allegations in her SAC after being afforded the opportunity to

15  preview Defendant's Motion to Dismiss.  (Dkt. Ent. 16.)  Specifically, Plaintiff again

16  alleges that BSRM intentionally concealed "material facts" specifically, information

17  concerning market conditions and how they might affect the value of the Property

18  from Plaintiff in order to induce Plaintiff to enter into the Loans.  (TAC ¶ 206.)

19  Plaintiff alleges that as a result of BSRM's concealment, Plaintiff entered into the

20  Loans and purchased the Property on the belief that "the value of the [Property was]

21  worth more than [it was] actually worth in light of the 'material facts.'" (*Id.* ¶ 209.)

22  Plaintiff goes on to detail (at great length) the purported home lending practices of

23  BSRM and other national lenders, but fails to assert a single factual allegation that the

24  Loans were improperly formed.  (TAC ¶¶ 66-195.)

25

26  _____

27  [3] JPMorgan Chase and Company, JPMorgan Securities, LLC, and the Bear Stearns

28  Companies, LLC are named as defendants but have no active involvement with the
    Loans.

-3-

From these allegations, Plaintiff asserts three causes of action:  fraudulent concealment and non-disclosure (violation of California Civil Code sections 1572, 1709, and 1710) (First Cause of Action); violation of California Business and Professions Code section 17200 (California's Unfair Competition Law, or "UCL") (Second Cause of Action); and negligence (Third Cause of Action).

Preliminarily, Plaintiff's entire TAC fails because all of Plaintiff's claims are barred by the applicable statute of limitations.  The TAC is also deficient because the Defendants did not owe Plaintiff any duty to disclose information about market conditions prior to Plaintiff obtaining the Loans.  Plaintiff cannot maintain claims stemming from an allegedly inadequate appraisal of the Property because appraisals that are made in connection with the origination of home loans are for the benefit of the lender, not the borrower.  Therefore, Plaintiff cannot establish any grounds giving rise to BSRM's liability for the alleged non-disclosure, and Plaintiff's causes of action for fraudulent concealment and negligence necessarily fail.  Furthermore, because Plaintiff cannot establish a predicate wrongful act by Defendants, and because Plaintiff lacks standing to bring claim for violation of UCL, the second cause of action fails as well.  Accordingly, the Chase Defendants respectfully request that the Court grant the motion to dismiss the TAC without leave to amend pursuant to FED. R. CIV. P. 12(b)(6).

## III.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal quotations and citations omitted).  When considering a FED. R. CIV. P. 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000).  However, mere conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." *Iqbal*, 129 S.Ct. at 1950.  In

-4-

other words, a pleading that only offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. *Id.* at 1949 (citations and internal quotation marks omitted).

A court should consider only those facts that are well pleaded and "then determine whether they plausibly give rise to an entitlement of relief." *Id.* at 1950. Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950.

Further, a complaint is subject to dismissal with prejudice without leave to amend if it is clear that amendment would be futile. *See Akhavein v. Argent Mortgage Co.*, No. 5:09-cv-00634 RMW (RS), 2009 WL 2157522, at *6 (N.D. Cal. July 18, 2009) (granting motion to dismiss with prejudice where any attempt to amend the claim would be futile).

## IV. ARGUMENT

### A. Plaintiff's TAC Fails in its Entirety Because the Claims Are Barred by the Applicable Statute of Limitations

Plaintiff's claims for fraudulent concealment, violation of UCL, and negligence arise from purported concealment that occurred at the time of the Loans' originations in 2006. (TAC ¶¶ 36-39.) Accordingly, the TAC is barred in its entirety by the applicable statute of limitations.

Under California law, fraud has a three-year statute of limitations and negligence has a two-year statute of limitations. Cal. Civ. Proc. Code § 338(d); Cal. Civ. Proc. Code § 335.1. The statute of limitations for a UCL claim is four years. Cal. Bus. & Prof. Code § 17208. Here, Plaintiff entered into the Loans on May 6, 2006, but did not file this lawsuit until February 28, 2012. (RJN, Exs. A-B.) Because the

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

purported omissions that form the basis of Plaintiff's TAC occurred almost six years before Plaintiff filed a complaint, all the claims are barred by their applicable statute of limitations.

Furthermore, Plaintiff's threadbare attempt to toll the applicable statutes of limitations fails because Plaintiff has not alleged any facts sufficient to justify the equitable tolling of the limitations periods. Plaintiff only alleges that "[i]n 2011, Plaintiff first discovered that in 2005, in an effort to expand loan volume, Bear Stearns knowingly and actively concealed . . . 'material facts" that negatively impacted the value of the" Loans. (TAC ¶ 192.) Plaintiff's vague statement fails to plead adequately any facts that warrant equitable tolling. Moreover, as <u>all</u> of the "material facts" alleged to have been concealed are matters of public record (*see* TAC ¶ 61-195), Plaintiff's "concealment" allegations are wholly unsupported. When a plaintiff fails to allege facts demonstrating that he or she could not have discovered the alleged violations by exercising reasonable diligence, dismissal is appropriate. *Meyer v. Ameriquest Mortgage Co.*, 342 F. 3d 899, 902 (9th Cir. 2003) (refusing to apply equitable tolling because plaintiff was in full possession of loan documents and did not allege any concealment of loan documents or other action that would have prevented discovery of alleged violations).

Here, Plaintiff was able to discover the purported "concealments" that allegedly inflated the Property's appraisal value because she could have obtained her own appraisal prior to obtaining the Loans. Indeed, as detailed *infra,* a home loan transaction is an arms-length transaction between a lender and borrower with clearly opposite interests. Plaintiff had ample opportunity to research market conditions potentially negatively affecting the Property's appraisal value, or Plaintiff could have simply compared the appraisal value of the Property to the market value of similarly situated homes in her neighborhood. Accordingly, because Plaintiff could have determined the value of the Property prior to the Loans' origination through the

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

exercise of reasonable diligence, Plaintiff is not entitled to equitable tolling and all of Plaintiff's claims are necessarily time-barred and should be dismissed with prejudice.

**B.      Plaintiff's Concealment And Negligence Claims Fail Because Defendants Did Not Owe Plaintiff a Duty to Disclose, and Plaintiff Cannot Plead The Requisite Elements of These Claims**

Plaintiff fails to state claims for concealment, non-disclosure, or negligence because Defendants did not owe her any duty with respect to the Loans.  Moreover, Plaintiff asserts no facts to support her conclusory contention that BSRM exceeded the scope of its conventional role as a lender in the Loan transactions by ordering the Appraisal, and further fails to realize that she was not justified in relying on BSRM's Appraisal to determine whether she should have entered Loans amounting to the full purchase price of the Property.  Accordingly, the claims should be dismissed.

*1.      Plaintiff's concealment and negligence causes of action fail because Defendants did not owe Plaintiff any duty in connection with the appraisal of the Property*

Defendants' arms-length relationship with Plaintiff does not give rise to any duty that would support a claim for fraudulent concealment, non-disclosure, or negligence.  Plaintiff's First Cause of Action for fraudulent concealment and non-disclosure alleges that Defendants concealed and failed to disclose information to the Plaintiff pertaining to market conditions and the risky nature of securitized loans, thereby inducing her to enter the Loans.  (TAC ¶¶ 206-211.)   Plaintiff's Third Cause of Action for negligence alleges that Defendants breached their "non-fiduciary duty" of care to Plaintiff by concealing potentially negative facts concerning the Property value and market conditions to induce Plaintiff into the Loans.  (*Id.* ¶¶ 206, 228.) Preliminarily, these claims fail because Plaintiff makes no attempt whatsoever to allege an "implicit duty of due care" owed by Defendants to make any disclosure to Plaintiff about either the appraiser or the then current market conditions.  (TAC ¶ 228.) Both causes of action additionally fail because Defendants owed Plaintiff no duty to disclose with respect to the Loans.

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

-7-

"[T]o establish fraud through nondisclosure or concealment of facts, it is necessary to show that the defendant was under a legal duty to disclose them." *Lingsch v. Savage*, 213 Cal. App. 2d 729, 735 (1963).  To establish a negligence claim, a plaintiff must plead that: (1) defendant owed plaintiff a duty of care; (2) defendant breached that duty; (3) the breach was the proximate or legal cause of the resulting injury; and (4) plaintiff was damaged.  *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996).  Here, Plaintiff's claims for fraudulent concealment and negligence fail because she has established no such duty owed by Defendants to Plaintiff.

As a general rule, "[a] commercial lender pursues its own economic interests in lending money."  *Perlas v. GMAC Mortg., LLC*, 187 Cal. App. 4th 429, 436 (2010).  Therefore, "a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money."  *Nymark v. Heart Fed. Sav. & Loan Ass'n*, 231 Cal. App. 3d 1089, 1093 n.1, 1096 (1991).  Indeed, absent special circumstances, a loan transaction is viewed as an "arms-length" arrangement in which no fiduciary relationship exists between the borrower and lender.  *Oaks Mgmt. Corp. v. Super. Ct.*, 145 Cal. App. 4th 453 (2006); *Roswell Capital Partners LLC v. Alternative Const. Techs.*, 638 F. Supp. 2d 360, 368 (S.D.N.Y. 2009) ("An arm's length borrower-lender relationship is not of a confidential or fiduciary nature.").

Here, despite Plaintiff's legal conclusion that Defendants owed her a duty to disclose, and the conclusory statement that "BSRM's involvement in the loan transaction exceeded the scope of its conventional role as a mere lender of money" (TAC ¶ 228), Plaintiff does not allege a single fact to suggest the existence of special circumstances giving rise to a fiduciary relationship between Plaintiff and BSRM or an instance where BSRM exceeded its role as a financial lender.  Rather, Plaintiff admits herself that the Chase Defendants were under a non-fiduciary duty with respect to Loans.  (TAC ¶ 206.)

To the extent that Plaintiff alleges Defendants owed her a non-fiduciary duty,

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

-8-

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

these claims are misguided because California law makes it clear that a lender owes borrowers no such duty where the lender is acting in the scope of its conventional role. *Nymark*, 231 Cal. App. 3d at 1093.  Plaintiff attempts to circumvent this well established rule by concluding that BSRM acted outside the scope of its conventional role as a lender because BSRM intentionally omitted "material facts" that negatively impacted the Property's appraisal value to induce her to enter into the Loans.  (TAC ¶ 228.)  However, California law makes it clear that a lender's efforts to protect the lender's security interest in the loan through a property appraisal is for the lender's protection, not the borrower's.  *Nymark*, 231 Cal. App. 3d at 1096 ("In preparing the appraisal, the defendant [acts] in its conventional role as a lender of money to ascertain the sufficiency of the collateral as security for the loan.")  Further, the allegations in the TAC directly contradict Plaintiff's contention that Defendants have exceeded their role as lender because <u>every</u> factual allegation regarding Defendants involves their activities as the originator of the Loans.  (*See* TAC generally.)

Plaintiff's allegations fall therefore within the conventional scope of BSRM's role as a lender of money in an ordinary-loan transaction, as Plaintiff's claims arise from a dispute over the value of the Property used as security for the Loans.  Accordingly, Defendants did not owe Plaintiff any duty, fiduciary or otherwise, to disclose any information in connection with the appraisal or the Loans.  Further, Defendants were under no duty to ensure Plaintiff was making a sound investment in choosing to purchase the Property entirely with the proceeds from the Loans.  *Nymark*, 231 Cal. App. 3d at 1096 ("The success of the [borrower's] investment is not a benefit of the loan agreement which the [lender] is under a duty to protect.") (citations omitted).  Consequently, Plaintiff cannot maintain her causes of action for concealment, non-disclosure, or negligence and the first and third causes of action should be dismissed without leave to amend.

DEFS' NOT. OF MOTION & MOTION TO DISMISS THIRD AMENDED COMPLAINT

## 2. *Plaintiff cannot plead the requisite elements to support her fraud based claims*

Notwithstanding a lack of duty to disclose owed by Defendants to Plaintiff, Plaintiff's fraud based claims still fail because she cannot allege an actionable concealment or justifiable reliance.  Plaintiff's first cause of action for fraud, deceit, and non-disclosure  alleges that in preparation of the Appraisal, the Chase Defendants omitted material facts concerning market conditions and BSRM's alleged improper practices of securitization and subprime lending that negatively impacted the value of the underlying property.  (TAC ¶¶ 206-211.)  Plaintiff further alleges that if she had known of the purported concealed facts, she would not have purchased the Property or obtained the Loans.  (*Id.* ¶ 206.)   Plaintiff's claim fails, however, because it incorrectly assumes that a borrower is entitled to rely on the lender's qualification process to determine if the property is sufficient security for a loan.  Both federal and California law make it clear that this is not the case.

FED. R. CIV. P. 9(b) requires that fraud be pled with particularity.  FED. R. CIV. P. 9(b).  To satisfy the pleading requirements of particularity under FED. R. CIV. P. 9(b), a complaint must "detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in the scheme." *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).  Indeed, the burden imposed by FED. R. CIV. P. 9(b) is substantial because fraud involves a serious attack on character; accordingly, fairness demands that the defendant receive the fullest possible details of the charges in order to prepare its defense. *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).  Every element must be alleged factually and specifically.  *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  The elements of a fraud claim are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage.

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

-10-

*Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995).[4]  A plaintiff's burden in asserting a fraud claim against a corporation is even higher.  *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 645 (1996).  In such a case, the plaintiff must allege "the names of the persons who made the allegedly fraudulent misrepresentations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written."  *Id.*

Here, Plaintiff has failed to satisfy the stringent requirements of FED. R. CIV. P. 9(b), as no actionable concealment or justifiable reliance exists with respect to the Appraisal.  In fact, Plaintiff was in as good a position as BSRM to determine the underlying value of the Property.  *See Nymark*, 231 Cal. App. 3d at 1099 ("One who seeks financing to purchase real property has many means available to assess the property's value and condition, including comparable sales, advice from a realtor, independent appraisal, contractors' inspections, personal observation, and the like.")  Moreover, Plaintiff cannot state a claim for fraud as a matter of law because a lender pursues its own economic interests in lending money, and BSRM's appraisal efforts were made for the purpose of ensuring that the Property provided adequate security for the Loans.  *Id.* (finding that a borrower should "know that the appraisal is intended for the lender's benefit to assist it in determining whether to make the loan, and not for the purpose of ensuring the borrower has made a good bargain.")   Accordingly, Plaintiff's claim that it is a "well-established California custom [for] prospective homebuyers, in lieu of conducting their own appraisal to satisfy the appraisal contingencies in their respective purchase, rely upon the appraisal of the lender," (TAC ¶ 21), even if true - and it is not – as the buyer negotiates the purchase price with the seller and then

---

[4] In addition, "to establish fraud through nondisclosure or concealment of facts, it is necessary to show that the defendant "was under a legal duty to disclose them." *Lingsch v. Savage*, 213 Cal. App. 2d 729, 735 (1963).  As discussed *supra*, Plaintiff's concealment claim fails because the Chase Defendants were under no such duty.

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

applies for a loan, cannot support a finding that Plaintiff was justified in relying on BSRM's purported concealment in the Appraisal.  Therefore, Plaintiff's fraud based claims fail and the first cause of action should be dismissed.

**C.    Plaintiff's Unfair Business Competition Claim Fails for Lack of a Predicate Wrongful Act by Defendants and Because Plaintiff Lacks Standing**

Plaintiff's cause of action for violation of UCL fails because Plaintiff has not suffered a loss of money or property, and thus lacks standing to bring such a claim. Further, because Plaintiff's claim is entirely predicated on the meritless claims asserted above, the cause of action necessarily fails.

*1.    Plaintiff lacks standing to assert a UCL claim*

Plaintiff is still in possession of the Property, and foreclosure proceedings have not commenced in connection with the Loans.  Moreover, Plaintiff has failed to set forth a single factual allegation that at the time the Loans originated, the value of the home was less than $1,100,000.  (*See* TAC generally.)  Plaintiff cannot establish that the home lending practices of Defendants harmed her in any way.  Indeed, she successfully purchased the Property as a result of BSRM's lending practices.  (*Id.* ¶¶ 203-205.)

"Standing to sue under [Section 17200], as defined by Business and Professions Code section 17204, is confined to any person who has suffered injury in fact and has lost money or property as a result of unfair competition."  *Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1554 (2011) (internal quotations omitted).   Standing to bring a claim under Section 17200 requires that a Plaintiff  "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e. economic injury, and (2) show that the economic injury was the result of, i.e. caused by, the unfair business practices . . . that is the gravamen of the claim." *Id.*

Here, Plaintiff has not shown and cannot show that Defendants have harmed her in any way.  Moreover, Plaintiff does not and cannot allege how Defendants are the proximate cause of any alleged injury.  Plaintiff voluntarily entered into the Loans, and

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

was free to obtain her own appraisal of the Property or outside advice prior to entering into the Loans. Moreover, any decline in the value of the Property and subsequent loss in equity to Plaintiff cannot be attributed to Defendants' alleged concealment of residential market conditions in the preparation of the Appraisal, nor can she establish that Defendants are solely responsible for the decline in property value nationwide as she seemingly attempts to do throughout the TAC. Thus, Plaintiff has not established standing to bring a UCL claim and the second cause of action fails.

> 2. *Plaintiff's UCL claim fails for lack of a predicate wrongful act*

Irrespective of Plaintiff's lack of standing, Plaintiff's cause of action for violation of the UCL still fails because her other causes of action are meritless. The UCL does not proscribe specific activities, but broadly prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "The UCL governs anti-competitive business practices as well as injuries to consumers, and has as a major purpose the preservation of fair business competition. By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Puentes v. Wells Fargo Home Mortg., Inc.*, 160 Cal. App. 4th 638, 643-44 (2008) (internal quotation marks and citations omitted). "Because . . . section 17200 is written in the disjunctive, it establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent." *Id.* at 644. Here, Plaintiff's allegations are insufficient to state a claim for violation of Section 17200 under any of these three prongs.

Under the "fraud" prong of the UCL, Plaintiff must show that "members of the public are likely to be deceived" by a defendant's practices. *In re Tobacco II Cases*, 46 Cal. 4th 298, 313 (2009) (internal citations and quotations omitted). Furthermore, this cause of action is generally derivative of some other illegal conduct or fraud committed by a defendant, and a plaintiff must "state with reasonable particularity the facts

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

-13-

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

supporting the statutory elements of the violation." *Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612, 619 (1993).

Plaintiff concludes that Defendants omitted material facts with the intent to induce Plaintiff to borrow money and use the proceeds to purchase the Property. (TAC ¶¶ 213, 228(D).) However, Plaintiff's allegations cannot support her concealment claim because Defendants did not owe the Plaintiff or any other borrower any duty to disclose with respect to the Loans. Accordingly, any fraud-based UCL claim asserted by Plaintiff fails.

Under the "unfair" prong of the UCL, Plaintiff must show that Defendants have violated public policy "tethered to specific constitutional, statutory or regulatory provisions." *Scripps Clinic v. Super. Ct.*, 108 Cal. App. 4th 917, 940 (2003) (citations omitted). Here, Plaintiff merely alleges that Defendants' negligence caused Plaintiff to, among other things, lose equity in her home. (TAC ¶ 214.) However, Plaintiff <u>cannot</u> attribute any loss in the Property's value to Defendants' purported negligence, as Defendants did not owe any such duty to Plaintiff. Furthermore, Plaintiff's generic statements fail to identify any specific statutory provision pursuant to which such a claim is being made, or specify the nature of any allegedly unfair practices with any degree of particularity or factual support. *Fortaleza v. PNC Fin. Servs. Group, Inc.*, 642 F. Supp. 2d 1012, 1025 (N.D. Cal. 2009) (holding "[v]ague allegations and mere labels and conclusions are insufficient" to allege a claim for unfair business practices). Accordingly, Plaintiff's UCL claim fails to satisfy the "unfair" prong of the UCL.

Finally, under the "unlawful" prong of the UCL, the UCL borrows violations of other laws and treats them as unlawful practices that are independently actionable as unfair competitive practices. *Cel-Tech Commc'ns v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Where a plaintiff cannot state a claim under the "borrowed" law, he or she cannot state a claim under the UCL. *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718 (2001); *Scripps Clinic*, 108 Cal. App. 4th at 938 (2003) (explaining that defendant cannot be held liable for unlawful business practices where

-14-

there was no violation of another law).  Here, the "unlawful" prong is not met because the TAC fails to allege any unlawful conduct or statutory violation.  Rather, Plaintiff merely relies on alleged wrongs under the causes of action listed above.  All of these claims must fail for reasons discussed *supra*.  Consequently, the UCL claim also fails.

## V.   **CONCLUSION**

Based on the foregoing, Defendants respectfully request that the Court grant the Chase Defendants' Motion to Dismiss and enter an order dismissing the TAC in its entirety with prejudice pursuant to FED. R. CIV. P. 12(b)(6).

Dated:  August 30, 2012                    WARGO & FRENCH LLP


                                           By: */s/ Jeff Williams*
                                               Mark L. Block
                                               Jeffrey N. Williams


                                           Attorneys for Defendants
                                           JPMorgan Chase Bank, N.A.
                                           (*erroneously sued as "JP Morgan Chase
                                           Bank, National Association"*);
                                           JPMorgan Chase and Company
                                           (*erroneously sued as "JP Morgan Chase
                                           and Company"*); JPMorgan Securities,
                                           LLC (*erroneously sued as "JP Morgan
                                           Securities, LLC"*); EMC Mortgage LLC;
                                           and The Bear Stearns Companies, LLC

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

DEFS' NOT. OF MOTION & MOTION TO DISMISS THIRD AMENDED COMPLAINT

# Exhibit A

1

2  George Spizzirri
   georgespizzirri@gmail.com
3  Attorney for Plaintiff
   Bar Number 277865
4  806 E Avenida Pico, Ste-I #313
   San Clemente CA 92673
5  Phone Number 949-218-4765
6  Facsimile Number 949-218-6737

7

8

9              IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
10                   SOUTHERN DIVISION

11

12

13
   ILEANA SPIZZIRRI                    )
14                                     )
                                       )
15     Plaintiff,                      )       Case No
16                                     )   SACV12-00311 JVS (RNBx)
   v.                                  )      Hon. James V. Selna
17                                     )      Ctrm 10C
18                                     )
   JPMORGAN CHASE BANK, N.A. )      Third Amended Complaint
19 JPMORGAN CHASE AND               )
   COMPANY; JPMORGAN                 )
20 SECURITIES, LLC;  EMC             )
   MORTGAGE, LLC;  THE BEAR          )
21 STEARNS COMPANIES, LLC.           )
22                                     )
                                       )
23                                     )
24                                     )
     Defendants                        )
25

26

27

                            1

## JURISDICTION AND VENUE

1. . Jurisdiction exists in this action pursuant to 28 U.S.C. § 1332, based on the complete diversity of citizenship between Plaintiff and Defendants. The amount at issue exceeds $75,000.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of property that is the subject of the action is situated.

3. This Court has jurisdiction over the Defendants because, upon information and belief, Defendants are either citizens of California, have sufficient minimum contacts in California, or otherwise intentionally avail themselves of the California market so as to render the exercise of jurisdiction over them by the California courts consistent with traditional notions of fair play and substantial justice

## JURY TRIAL DEMAND

4. Plaintiff requests a jury trial on all issues in this matter.

## PARTIES

### I.  The Plaintiff

5. Plaintiff, Ileana Spizzirri (the "Plaintiff") is an individual residing in the State of California and a citizen of the State of California who borrowed money in May of 2006 from Bear Stearns Residential Mortgage Corporation ("BSRM"), a wholly-owned subsidiary of the Bear Stearns

Companies, Inc., ("BSI"). The monies borrowed were evidenced by two notes and  secured by two deeds of trust (the "Plaintiff's two mortgages") on the real property purchased by Plaintiff located at 2149 Via Aguila, San Clemente, CA 92673 (the "underlying property").  Plaintiff alleges that she has been harmed and damaged individually by the Defendants. The terms "deed of trust" and "mortgage" are used herein and throughout this Initial Second Amended Complaint interchangeably.

**II. The Non-Parties**

6.     Plaintiff is informed and believes as follows: Bear Stearns and Companies, Inc. ("BSI") was, at all relevant times herein, a holding company that provided investment banking, securities, and derivative trading services to its clients through the following wholly-owned subsidiaries of BSI: (i) Bear Stearns & Co. Inc. ("BSC"), (ii) EMC Mortgage Corporation ("EMC), (iii) Structured Asset Mortgage Investments II Inc. ("SAMI"), (iv) Bear Stearns Asset Backed Securities LLC ("BSABS"), EMC Residential Mortgage Corporation ("EMCRC"); and Bear Stearns Residential Mortgage Corporation ("BSRM"). From 2001-2007, BSI and its Subsidiaries, acting in concert with each other and under the direction of BSI, specialized in originating, acquiring, pooling, securitizing, selling and servicing subprime, Alt-A and complex

3

mortgages; i.e., nontraditional mortgages. Relative to the U.S. population, a significant percentage of nontraditional mortgages including Plaintiff's two mortgages were originated in the State of California.  BSI and its Subsidiaries are not parties to this action (collectively, BSI and the above subsidiaries are referred to herein as "BSI and its Subsidiaries").

7.      All of the mortgages **acquired** by Bear Stearns for securitization in 2005-2007 were originated and sold to Bear Stearns by the following originators: Long Beach Mortgage, Countrywide, New Century Mortgage, WMC, Argent, Ameriquest, Fremont, ResMAE, American Home, IndyMac, GreenPoint, People's Choice, Fieldstone, PHH, Option One, and SouthStar (collectively, the above entities are referred to as the "Bear Stearns third-party originators" or simply the "originators").  The "Bear Stearns third-party originators" are not parties to this action.

**III.   Defendants**

8.  Plaintiff is informed and believes as follows: At the time of filing the Initial Complaint, JPMorgan Chase & Company (Defendant "JPMorgan Chase") was a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 270 Park

4

Avenue, New York, N.Y. 10017-2010.  As a consequence, for purposes of diversity jurisdiction, Defendant JPMorgan Chase is a citizen of the State of Delaware and the State of New York. On or about March 30, 2008, Defendant JPMorgan Chase entered into an Agreement and Plan of Merger (the "Merger") with BSI, making Defendant JPMorgan Chase successor-in-interest to BSI and its Subsidiaries. Defendant JPMorgan Chase is liable for the wrongdoing of BSI and its Subsidiaries, in their entirety, under common law, because BSI and its Subsidiaries merged and consolidated with Defendant JPMorgan Chase, because Defendant JPMorgan Chase has expressly or impliedly assumed the tort liabilities of BSI and its Subsidiaries, and because Defendant JPMorgan Chase is a mere continuation of BSI and its Subsidiaries. This action is thus brought against Defendant JPMorgan Chase as successor-in-interest to BSI and its Subsidiaries. As a result of the Merger, all allegations contained herein against BSI and its Subsidiaries are thus made against Defendant JPMorgan Chase as successor-in-interest to BSI and its Subsidiaries. .

9. Plaintiff is informed and believes as follows: Pursuant to the Merger, BSI merged with The Bear Stearns Companies, LLC (Defendant BSLLC"). At the time of filing the Initial Complaint, (i) Defendant BSLLC was a limited liability company organized and existing under the laws of the

5

State of Delaware with its principal place of business located at 383 Madison Avenue, New York, N.Y., 10179, and (ii) Defendant BSLLC's sole member was Defendant JPMorgan Chase. As previously stated, at the time of filing the Initial Complaint, Defendant JPMorgan Chase was a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, N.Y. 10017-2010. As a consequence, for purposes of diversity jurisdiction, Defendant BSLLC was, at the time of filing the Initial Complaint, a citizen of the same two states its sole member, Defendant JPMorgan Chase, was a citizen of; namely, the State of Delaware and the State of New York. As a result of the Merger, Defendant BSLLC became successor-in-interest to BSI. As successor-in-interest to BSI, Defendant BSLLC is liable for the wrongdoing of BSI, in its entirety, under common law, because BSI  merged and consolidated with Defendant BSLLC,  because Defendant BSLLC has expressly or impliedly assumed the tort liabilities of BSI, and because Defendant BSLLC is a mere continuation of BSI. This action is thus brought against Defendant BSLLC as successor-in-interest to BSI. As a result of the Merger, all allegations contained herein against BSI are thus made against Defendant BSLLC as successor-in-interest to BSI.

10. Plaintiff is informed and believes as follows: On May 30, 2008, pursuant to the Merger, BSC merged with JPMorgan Securities, Inc.  At the time of the Merger, and up until September of 2010, JPMorgan Securities Inc. was a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 277 Park Avenue, New York, N.Y. 10172, and a wholly owned subsidiary of Defendant JPMorgan Chase. In September of 2010, JPMorgan Securities Inc. converted to a Delaware limited liability company with its principal place of business located at 277 Park Avenue, New York, N.Y. 10172. As a result of the conversion, JPMORGAN Securities, Inc. changed its name to JPMorgan Securities, LLC ("Defendant JPMORGAN Securities"). Thus, at the time of filing the Initial Complaint, Defendant JPMorgan Securities was a Delaware limited liability company and its sole member was Defendant JPMorgan Chase.  As previously stated, at the time of filing the Initial Complaint, Defendant JPMorgan Chase was a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, N.Y. 10017-2010. As a consequence, for purposes of diversity jurisdiction, Defendant JPMorgan Securities was, at the time of filing the Initial Complaint, a citizen of the same two state's its sole member, Defendant JPMorgan Chase, was a citizen of; namely, the State of New

7

York and the State of Delaware. As a result of the Merger, Defendant JPMorgan Securities became liable for BSC's wrongdoing, in its entirety, under common law, because BSC merged and consolidated with JPMorgan Securities Inc., and JPMORGAN Securities Inc. subsequently merged and consolidated with Defendant JPMorgan Securities, because Defendant JPMorgan Securities has expressly or impliedly assumed BSC's and JPMorgan Securities Inc.'s tort liabilities, and because Defendant JPMorgan Securities is a mere continuation of BSC and JPMorgan Securities Inc.. This action is thus brought against Defendant JPMorgan Securities as successor-in-interest to BSC/JPMorgan Securities Inc. As a result of the Merger, all allegations against BSC/JPMorgan Securities Inc. are thus made against JPMorgan Securities as successor-in-interest to BSC/JPMorgan Securities Inc.

11. Plaintiff is informed and believes as follows: Prior to the Merger, EMC Mortgage Corporation (previously, "EMC"), a mortgage servicing company, was a Delaware corporation with its principal place of business located at 2780 Lake Vista Drive, Lewisville, Texas 75067 and a wholly-owned subsidiary of BSI. After the Merger, EMC became a wholly owned subsidiary of Defendant BSLLC with its principal place of business located at 2780 Lake Vista Drive, Lewisville, Texas 75067. On

March 31, 2011, EMC converted from a Delaware corporation to a Delaware limited liability company and changed its name from EMC Mortgage Corporation to EMC Mortgage LLC ("Defendant EMC") with its principal place of business remaining located at 2780 Lake Vista Drive, Lewisville, Texas 75067. Thus, at the time of filing the Initial complaint, (i) Defendant EMC was a Delaware limited liability company; and (ii) Defendant EMC's sole member was Defendant BSLLC. As previously stated, at the time of filing the Initial Complaint, (i) Defendant BSLLC was a Delaware limited liability company; (ii) Defendant BSLLC's sole member was Defendant JPMorgan Chase; (iii) Defendant JPMorgan Chase was a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, N.Y. 10017-2010; and (iv)  as a consequence, for purposes of diversity jurisdiction, Defendant EMC was a citizen of the same two state's its sole member, Defendant JPMorgan Chase, was a citizen of; namely, the State of New York and the State of Delaware. Plaintiff is further informed and believes that in October of 2011, Defendant EMC changed its name to "Chase Mortgage, LLC." However, at the time of the filing of the Initial Complaint, Defendant EMC had not informed the California Secretary of State of its name change and Defendant EMC continues to do business in the State of

California under the name of EMC Mortgage LLC with its principal place of business at 2780 Lake Vista Drive, Lewisville, Texas 75067. Defendant EMC is liable for EMC's wrongdoing, in its entirety, under common law, because EMC merged and consolidated with Defendant EMC, because Defendant EMC has expressly or impliedly assumed EMC's tort liabilities, and because Defendant EMC is a mere continuation of EMC.  This action is thus brought against Defendant EMC as successor-in-interest to EMC. As a result of the Merger, all allegations against EMC are made against its successor-in-interest, Defendant EMC.

12. Plaintiff is informed and believes as follows:  At the time of filing the Initial Complaint, JPMorgan Chase Bank, N.A. ("Defendant Chase") was a (i) national banking association, (ii) a wholly owned banking subsidiary of Defendant JPMorgan Chase, (iii) a Delaware corporation with its principal place of business located in Columbus, Ohio, (iv) a member of the Federal Reserve System and (v) its deposits are insured by the Federal Deposits Insurance Corporation ("FDIC"). On April 1, 2011, Defendant EMC assigned to Defendant Chase, the mortgage servicing rights and Servicing Agreements it had acquired from EMC in March of 2008. As a result, servicing of the mortgage loans previously serviced by

EMC and its successor-in-interest, Defendant EMC, was transferred to Defendant Chase on April 1, 2011. Plaintiff is further informed and believes that the transfer of servicing rights and the Servicing Agreements to Defendant Chase is permitted by and complies with the terms of the Servicing Agreements and Defendant Chase agreed to be bound by the terms and conditions of the related Servicing Agreements. From March of 2008 until April 1, 2011, records for loans acquired from EMC were maintained by Defendant EMC under Defendant Chase's control, management and supervision. Effective April 1, 2011, those same records are now maintained by Defendant Chase as a result of its acquisition of the servicing rights and the assignment of the Servicing Agreements. After the Merger and until April 1, 2011, Defendant EMC's sole and primary business involved the servicing and maintaining of the mortgage loans originated and acquired for securitization by its predecessor-in-interest, EMC. As a result of the acquisition of these servicing rights from Defendant EMC, Defendant Chase is liable for EMC and Defendant EMC's wrongdoing, in their entirety, under common law, because the transfer under California law amounts to a de facto merger of Defendant EMC with Defendant Chase, because inadequate consideration was given to Defendant EMC for the assets it

assigned to Defendant Chase to meet the claims of its unsecured creditors, because there is complete identity of ownership between Defendant Chase and Defendant EMC; i.e., Defendant Chase is a wholly owned subsidiary of Defendant JPMorgan Chase and Defendant EMC's sole member is Defendant Chase, and because Defendant Chase is a mere continuation of EMC and Defendant EMC. This action is thus brought against Defendant Chase based on Defendant Chase's successor liability under California law for the wrongdoing of EMC and Defendant EMC. As a result of its successor liability, all allegations against EMC and Defendant EMC are thus made against Defendant Chase.

13. Collectively, Defendant JPMorgan Chase as successor-in-interest to BSI and its Subsidiaries, Defendant BSLLC as successor-in-interest to BSI, Defendant JPMorganSecurities as successor-in-interest to BSC; Defendant EMC as successor-in-interest to EMC, and Defendant Chase, as successor-in-interest to Defendant EMC (collectively, all of the Defendants are referred to herein as the "JPMorgan Defendants").

14. Collectively, the JPMorgan Defendants and the non-parties BSI and its Subsidiaries are referred to herein as "Bear Stearns" or the "Bear Stearns Entities."

15. Plaintiff is informed and believes as follows: At all times herein mentioned, the Bear Stearns Entities were the agents, employees, partners, joint venturers, coconspirators, successors or predecessors in interest, owners, and principals, and employers of each other, and in doing the things hereinafter alleged, were acting within the course and scope of such agency, partnership, employment, ownership, joint venture and/or conspiracy. Plaintiff is further informed and believes and based thereon alleges that the acts and conduct herein alleged of the Bear Stearns Entities, were known to, authorized by, and/or ratified by each of them. .

16. DOE Defendants 1-50, inclusive, are individuals and/or businesses whose forms are unknown and were agents, principals, employees, employers, and co-conspirators of each and every other named or unnamed Defendant in this complaint. Plaintiffs are informed and believe, and thereon allege, that each of such Defendants is, and at all relevant times was, acting within the scope of their authority as such agents, employees, or alter-egos and with the permission and consent of the remaining named and un-named co-Defendants.

17. The true names and/or capacities of Defendants 1-50, inclusive, are unknown to Plaintiff, and therefore it sues said Defendants by such

13

fictitious names. Plaintiff is informed and believes and thereon alleges that each of the Defendants fictitiously named herein as a DOE is responsible for the events and happenings hereinafter referred to, and thereby proximately caused the injuries and damages to Plaintiffs as hereinafter alleged. Plaintiffs will seek leave of the Court to amend her Third Amended Complaint to allege the true names and/or capacities of said fictitiously named Defendants when ascertained.

18. Whenever in this Third Amended Complaint an act or omission of a corporation or business entity is alleged, the said allegation shall be deemed to mean and include an allegation that the corporation or business entity acted or omitted to act through its authorized officers, directors, agents, servants, and/or employees, acting within the course and scope of their duties, that the act or omission was authorized by corporate managerial officers or directors, and that the act or omission was ratified by the officers and directors of the corporation.

19. Plaintiff, alleges the following upon personal knowledge as to herself and her own acts and upon information and belief as to all other allegations.

## **SUMMARY OF THE ACTION**

20. Plaintiff alleges causes of action for fraud pursuant to <u>California Civil Code §§ 1572, 1709 and 1710</u>;  unlawful and fraudulent business practices pursuant to <u>California Business & Professions Code §§ 17200, et seq.</u>, and the common law of negligence against all Defendants as successors-in-interest to BSI and its subsidiaries.

21. In April of 2006, Plaintiff applied to BSRM for a loan to finance the purchase of a home in San Clemente, California. After preparing and reviewing an appraisal on Plaintiff's property, BSRM represented to Plaintiff that the value of the property she was purchasing was equal to the full amount of the purchase price. In lieu of conducting her own appraisal to satisfy the appraisal contingency in her purchase agreement, Plaintiff relied upon the appraisal of BSRM and closed the transaction on or about May 6, 2006. In relying on BSRM's representation of value, Plaintiff followed a well-established California custom in which prospective homebuyers, in lieu of conducting their own appraisal to satisfy the appraisal contingencies in their respective purchase, rely upon the appraisals of their lender based on the  generally shared belief promoted by mortgage lenders that their appraisals are reliable because conducted for the interests of the lender, not the borrower; i.e., conducted for the purpose of determining the adequacy and sufficiency of the

15

underlying collateral to support their loans, and not for the purpose of inducing prospective homebuyers to enter into a loan transaction or to assure the homebuyer that his collateral is sound.

22. Five years later, Plaintiff learned the following: BSRM was a wholly-owned subsidiary of BSI, and that BSRM in conjunction with the other BSI subsidiaries were engaged and had been engaged since 2001 in the business of originating, acquiring, pooling, servicing and selling to investors, securities backed by sub-prime, Alt-A and Alt-B residential mortgages; that is, "nontraditional mortgages" as that term is defined more fully below in paragraphs 61-65. In 2005, in an effort to expand loan volume, the Bear Stearns Entities, under the interest, ownership, direction and control of their parent corporation, BSI, conspired and agreed with each other to conceal from their investors, bond insurers, credit rating agencies, shareholders, SEC regulators, independent appraisers, and prospective homebuyer borrowers including Plaintiff , certain "material facts" believed to be true by the Bear Stearns Entities that, *inter alia*, negatively impacted the value of the appraisals on the collateral supporting their loans (a more complete description of the term "material facts" is set forth below in the section entitled, "The Concealed Material Facts").

16

## I.  **The Fraud Claim**

23. The concealed "material facts" were only known by or accessible to the Bear Stearns Entities and they actively prevented investors, bond insurers, credit rating agencies, shareholders, SEC regulators, independent  appraisers, and borrowers, including Plaintiff, from discovering the "material facts." As a result of their exclusive knowledge of the "material facts", their prevention of others from discovering these "material facts", and their knowledge that such "material facts" were not known to or within reach of the diligent attention and observation of others including Plaintiff, the Bear Stearns Entities were under a non-fiduciary duty to disclose the "material facts" to Plaintiff in their preparation and review of the appraisal on Plaintiff's property. However, the Bear Stearns Entities breached their duty of disclosure in order to induce Plaintiff to enter into a loan transaction under the false belief that the value of the home Plaintiff was purchasing was equal to the purchase price. However, it wasn't. Had the Bear Stearns Entities disclosed the "material facts" to Plaintiff, she would not have borrowed money from BSRM or purchased the San Clemente property. Having failed to do so, this conduct constituted actionable fraud and deceit on the part of the Bear Stearns Entities.

17

## II. The Negligence Claim

24. By failing to disclose the "material facts" to Plaintiff in their preparation and review of the appraisal on Plaintiff's property, Bear Stearns transformed the appraisal process from a process in which appraisals are prepared and reviewed by the lender to ascertain the adequacy and sufficiency of the collateral used to support a loan, into a process in which appraisals are used to induce prospective borrowers, like Plaintiff, to enter into a loan transaction under the false belief that the value of the home being financed is equal to the appraisal. As a result of this transformation of the appraisal process, Bear Stearns owed an explicit duty of care to Plaintiff in the preparation and review of the appraisal on Plaintiff's property and this meant that Bear Stearns should have considered "material facts" that would negatively impact the value of Plaintiff's property. Had Bear Stearns considered the negative impact the material facts had on the appraisal of Plaintiff's property, they would have reduced the value assigned to Plaintiff's property by their independent appraiser or changed their underwriting standards and guidelines the effect of which would be to require Plaintiff to increase its equity investment in the property (loan-to-value ratio), or simply disclose the "material facts" to Plaintiff. By failing to do any of the above, Bear

Stearns breached the duty of care it owed to Plaintiff. As a consequence of the breach, Plaintiff purchased the property under the good faith belief that the value of the property was equal to the purchase price. Had Bear Stearns exercised reasonable care in the preparation and review of the appraisal, Plaintiff would not have purchased the property.  These consequences would have reasonably been foreseen by a person of ordinary intelligence in the light of attending circumstances.

25. Furthermore, Bear Stearns owed an implicit duty of care to exercise reasonable care in the preparation and review of the appraisal on Plaintiff property based on the following factors: [1] The preparation and review of the appraisal on Plaintiff's property was undoubtedly intended to affect the Plaintiff in that the outcome of the appraisal determined whether the collateral would support a finance arrangement based on a 90% loan to purchase price.  [2] Likewise, it was readily foreseeable that by inflating the value of Plaintiff's property to an amount equal to the Plaintiff's purchase price, Plaintiff could be induced to purchase the property on the mistaken belief that it was worth more than it was actually worth. (3) The injury to Plaintiff is certain because had she known the house she was purchasing was worth less than the purchase price, she would not have purchased the property. [4] The failure of Bear

19

Stearns to take into account the concealed "material facts" in the preparation and review of the appraisal on Plaintiff's property is directly related to the injury Plaintiff suffered.  [5] Plaintiff's injury was caused by Bear Stearns moral failure to exercise reasonable care in the preparation and review of the appraisal on the San Clemente property. [6] Public policy is better served by preventing lenders from conducting appraisals that are designed to induce prospective borrowers to enter into a loan transaction or into believing that the underlying property supporting the loan is sound.

### III.    The Unfair Competition Claim

26. Plaintiff's Unfair competition claim alleges that Bear Stearns violated California's unfair competition law ("UCL") by consummating an unlawful  and fraudulent practice. Plaintiff alleges that the Bear Stearns Entities actions were "unlawful" because they violated <u>California Civil Code §§ 1572, 1709 and 1710</u>;  and the common law of negligence. Plaintiff also alleges they were fraudulent for the reasons set forth in the body of this Third Amended Complaint. Plaintiff further alleges that she was injured in fact and as a result of her injury, suffered monetary damages.

### <u>STATEMENT OF THE FACTS</u>

### I.  Plaintiff Two Mortgages

27. Plaintiff is a Board Certified primary care physician, and a partner in the Southern California Permanente Medical Group ("SCPMG"), a partnership consisting of doctors who provide medical services for Kaiser Permanente in Orange County California.

28. Plaintiff resided in Newport Beach California from November 14, 2000 until March of 2005. In March of 2005, Plaintiff accepted a position as a primary care physician with SCPMG. In May of 2005, Plaintiff leased the underlying property and moved from Newport Beach to San Clemente. The lease was for one year term at a monthly rent of $3,100.

29. In February of 2006, the prior owner of the underlying property offered to sell the underlying property to Plaintiff for $1,100,000. Plaintiff wanted to purchase the underlying property but did not want to purchase it unless she could remodel and refurbish the underlying property. Given her limited cash reserves, Plaintiff decided to purchase the underlying property only if she could (i) obtain financing for 90% of the purchase price; and (ii) obtain a form of financing that enabled her to make monthly mortgage payments for the first 3 to 5 years of the loan that did not exceed the sum of $5,000.00 per month.

30. In February of 2006, Plaintiff executed a contract to purchase the underlying property for $1,100,000 (the "Purchase Agreement"). An escrow was opened and the transaction was scheduled to close on May 15, 2006.

31. The Purchase Agreement contained two conditions that would have to be satisfied before Plaintiff was obligated to purchase the underlying property. The two conditions were as follows: (i) the underlying property must appraise for at least $1,100,000 (the "Appraisal Contingency") and (ii) Plaintiff must obtain mortgage financing equal to 90% of the purchase price (the "Loan Contingency").

32. In an effort to arrange financing, Plaintiff contacted CTX Mortgage ("CTX"); a mortgage banker and a mortgage broker. After explaining the kind of mortgage terms Plaintiff required, CTX informed Plaintiff that the mortgage products that would best fit Plaintiff's needs was an option ARM 1st mortgage, financing 80% of the purchase price, and a 2nd mortgage, financing 10% of the purchase price. CTX described the Option ARM and 2nd mortgage loan programs to Plaintiff, and told Plaintiff that CTX would select a lender who originated these kinds of loans from the list of lenders from which CTX was pre-approved to

22

broker option ARM mortgage loans. Plaintiff indicated that these terms met her needs.

33. At CTX's request, Plaintiff verbally provided CTX with information to be used to complete a Loan Application and verbal authorization for CTX to obtain Plaintiff's credit reports. CTX also requested that Plaintiff fax a copy of the purchase agreement to CTX; which Plaintiff did.

(i) On or about the following day, CTX called and informed Plaintiff of the following: (i) CTX believed that Plaintiff qualified for a loan under the option ARM program; that (ii) CTX would select the appropriate lender to fund Plaintiff's loan, and once selected, that lender would provide Plaintiff with a good faith estimate of the terms of the loan; (iii) that as a condition to making the loan, the selected lender would require that the underlying property appraise for the full amount of the purchase price; (iv) that to assist the lender in determining whether the value of the underlying property was adequate security for Plaintiff's loan, an independent appraiser, approved by the lender, must first conduct an appraisal on the underlying property; (v) that once the appraisal was completed, the lender would review the appraisal and approve it or modify it as the lender saw fit; (v) that the lenders representations of value would then be communicated to CTX and CTX would inform

Plaintiff of the outcome; (vi) that if the lender valued the underlying property at an amount equal to the purchase price, and all other conditions of the lender were satisfied or waived, the loan could fund shortly thereafter; (vii) that Plaintiff would be furnished with a copy of the appraisal after the closing, and (viii) that it was standard practice for the borrower to pay for the independent appraisal.

34. Plaintiff agreed to and subsequently paid for the appraisal to be conducted by the independent appraiser. .

35. In early March of 2009, CTX Mortgage informed Plaintiff that the independent appraisal would be conducted by West Coast Appraisers.

36. In April of 2006 Plaintiff was informed that CTX had identified BSRM as the mortgage lender, and that BSRM was in possession of the Loan Application prepared by CTX Mortgage, a copy of Plaintiff's Purchase Agreement, Plaintiff's credit reports, a preliminary title report on the underlying property, and a copy of the appraisal conducted by West Coast Appraisers.

37. In late April or the first week of May of 2006, Plaintiff was informed by BSRM through CTX that(i)  the underlying property appraised the for the full amount of the purchase price and (ii) BSRM was prepared to fund Plaintiff's loan request to finance 90% of the purchase on the underlying

property. CTX Mortgage further informed Plaintiff that loan documents would be prepared for Plaintiff's review and signature.

38. Relying on the representations of BSRM that the underlying property appraised for the full amount of the purchase price and believing that BSRM's representation of value was made in the good faith belief that the underlying property was adequate security for BSRM's loan, Plaintiff (i) waived the Appraisal and Loan Contingencies set forth in the Purchase Agreement, (ii) deposited into escrow all additional funds needed to close the transaction, and (iii) signed loan documents prepared by BSRM.

39. Plaintiff relied upon BSRM's representation of value concerning the underlying property without conducting an independent inquiry or investigation into the value of the underlying property based on the following circumstances:

A. Plaintiff reasonably believed that BSRM was in the business of lending money to prospective residential homeowners and securing the money borrowed with one or more mortgages on the borrowers homes (the "collateral");

B. Plaintiff reasonably believed that BSRM prepared and reviewed appraisals on all of the homes it considered financing for the purpose of

25

ascertaining the adequacy of the underlying collateral as security for its loans;

C. Plaintiff reasonably believed that to assist BSRM in ascertaining the value of the underlying property, BSRM obtained an appraisal from an independent appraiser that was in conformity with all federal, state and local rules and regulations.

D. Plaintiff reasonably believed that the independent appraisal was properly prepared and internally reviewed by BSRM, and that BSRM possessed the resources, knowledge, skill, expertise and experience to prepare and review appraisals for the purpose of ascertaining the adequacy of the underlying collateral as security for its loans;

E. Plaintiff reasonably believed that in preparing the appraisal, BSRM provided the independent appraiser with all relevant and reliable information in its possession that could meaningfully impact the value of the underlying property in order (i) to enable the appraiser to factor such information into its appraisal of the underlying property, and (ii) to insure that the independent accurately ascertained the adequacy of the collateral as security for BSRM's loans.  Or in the alternative, Plaintiff believed that in reviewing the appraisal, BSRM would factor all relevant and reliable information in its  possession into the review of the appraisal that

26

could meaningfully impact the value assigned by its independent appraisers;

F. Plaintiff reasonably believed that BSRM and the Plaintiff had a long term mutual economic interest and stake in the accuracy and integrity of the appraisal on the underlying property;

G. Plaintiff reasonably believed that by relying on the representations of value made by BSRM, Plaintiff was following a long standing, customary and regularly accepted practice followed for many years by an overwhelmingly high percentage of California homebuyers who finance the purchase of their homes. Under this customary practice, California homebuyers rely on their lender's representations of value in lieu of conducting an independent investigation or inquiry into the value of the homes they are planning to purchase largely because these California homebuyers have been led by real estate brokers and agents, mortgage brokers, mortgage lenders and their common sense into believing that mortgage lenders conduct appraisals for the purpose of determining the adequacy of the collateral used to secure their loans and not to induce homebuyers into borrowing money to purchase a home (the "Customary Practice").

H.  Based on the above reasonable beliefs, Plaintiff reasonably relied upon the representations of value made by BSRM concerning the underlying property; waived the appraisal contingency in her purchase contract, and closed the transaction..

40. The transaction funded and closed on or about May 6, 2006. All right, title and interest in the underlying property was vested in "Ileana Spizzirri, a married woman, as her sole and separate property," subject to two BSRM mortgages; a 1st mortgage in the amount of $880,000 and 2nd mortgages in the amount of $110,000 (the 1st and 2nd mortgages are collectively referred to sometimes as "BSRM's two mortgages" or "Plaintiff's two mortgages").

41. The 1st mortgage was an option ARM mortgage payable over a 30 year period. In the first 5 years of the loan, the interest rate was adjustable with four optional type payments that could be selected on a month by month basis by the borrower. The four option payments were as follows: (i) a minimum payment based on a 1% interest rate amortized over 30 years with any negative difference between the minimum payment and adjustable rate being added to the loan balance in the form of a negative amortization; (ii) an interest only payment, based on the adjustable rate payment of the preceding month, (iii) a 15 year fully amortized payment

28

based on the adjustable rate; and (iv) a 30 year fully amortized payment based on the adjustable rate. At the end of 5 years, the option payments ended and the borrower was required to make a fully amortized payment for the next 25 years based on a the same adjustable rate of interest used in the first 5 years of the loan with a Cap rate of 9.95%..

42. The 2nd mortgage was a fixed rate of interest loan payable over 30 years at 10.625% interest.

43. The term "mortgage" and "deed of trust," as previously stated, are used interchangeably herein.

44. Subsequent to the May 6, 2006 closing, Plaintiff received the following documents: (i) a copy of the independent appraisal from CTX Mortgage, and copies of all the documents signed by Plaintiff immediately prior to the closing from the escrow company,. .

45. From May 6, 2006 through March of 2008, all monthly mortgage payments due on the 1st and 2nd mortgages were paid in a timely fashion to EMC, as servicer of the two BSRM mortgages. From March of 2008 through October of 2009, all monthly mortgage payments due on the 1st and 2nd mortgages were paid in a timely fashion to Defendant EMC, as the servicer of the two BSRM mortgages. All other payments required under BSRM's two mortgages were also paid on a timely basis.

29

## II. The Request for Loan Modification

46. In early 2009, Plaintiff wished to obtain a loan modification that would convert the adjustable rate feature of the loan to a fixed rate of interest. Plaintiff contacted Defendant EMC and was informed that she would have to be in default for at least 90 consecutive days before a loan modification request would be acted upon. Plaintiff subsequently defaulted on her property taxes, and then re-contacted Defendant EMC 90 days later to apply for a loan modification. Plaintiff was informed by Defendant EMC that failure to pay the property taxes did not constitute a default for loan modification purposes and further informed that to qualify for loan modification, she would have to be in default on her monthly mortgage payments for at least 90 consecutive days before the request for loan modification could be acted upon.

47. Plaintiff subsequently defaulted on her monthly mortgage payments in November of 2009, December of 2009, and January of 2010.

48. In Late January of 2010, Plaintiff contacted the loss mitigation department of Defendant EMC to initiate a loan modification. Defendant EMC stated that Plaintiff would be allowed to apply for loan modification under their in-house loan modification program but not under the Obama program because her loan balance was too great to

30

qualify under the Obama program. But before considering Plaintiff's request for loan modification, Defendant EMC required Plaintiff to make three consecutive monthly trial payments of $2,900 per month starting in February of 2010.  Furthermore, Defendant EMC informed Plaintiff that she could file a formal loan modification request at any time after trial payments commenced but Defendant EMC would not begin processing the loan modification application until after Plaintiff had successfully completed three successive monthly trial payments. Finally, Defendant EMC informed Plaintiff that if a decision was not made on the loan modification request after the three monthly trial payments had been made, Plaintiff should continue making the $2,900 monthly trial payment until a decision was reached by Defendant EMC.  Plaintiff subsequently made monthly mortgage trial payments made from February thru August of 2010.

49. In late August, Plaintiff was informed that she had been disapproved under the Obama loan modification program because her loan balances were in excess of $729,000.00..

50. In several subsequent conversations with Defendant EMC, Plaintiff argued with representatives in the loss mitigation department that it was understood by the parties that Plaintiff's initial loan modification request

was to be processed under EMC's in-house program and not under the Obama program. Subsequently, Defendant EMC agreed to reconsider Plaintiff's loan modification application under the EMC in-house loan modification program. A few weeks later, Plaintiff was informed that the in-house request for loan modification was rejected in late August of 2010; that is, nearly one month before Defendant EMC had agreed to reprocess the loan modification application under their in-house program.

51. Over the next several months, Plaintiff endeavored to have Defendant EMC reprocess her loan modification application under their in-house loan modification program. Finally, in early January of 2011, Plaintiff was informed that if she were to submit a 2nd loan modification application under Defendant EMC's in-house loan modification program, the loss mitigation department would reconsider the matter.

52. In late January of 2011, Plaintiff prepared and submitted a second loan modification application to EMC.

53. At the time of submitting the second request for loan modification, Plaintiff's confidence in Defendant EMC had diminished to a point in which Plaintiff no longer trusted Defendant EMC. Plaintiff's distrust was directly related to (i) Defendant EMC's processing of the first loan modification under the Obama program knowing beforehand that

32

Plaintiff was not eligible for the Obama program and that her monthly

trial payments were being made on a non-existent program, and (ii)

Defendant EMC's claim that they had denied Plaintiff's in-house request

for loan modification approximately one month before Defendant EMC

had agreed to reprocess the loan modification application under their in-

house program.

54. In short, Plaintiff felt like she was getting the "run-around" from

Defendant EMC and she could not understand why Defendant EMC was

behaving as it was. As a result, Plaintiff' became distrustful of Defendant

EMC, and coupled with Plaintiff growing awareness of accounts

surfacing in the media regarding the significant role financial services

industries, such as Bear Stearns, played in causing the economy to recess

and home prices to collapse,    Plaintiff asked her husband, attorney

George Spizzirri, to conduct an investigation into all of the circumstances

surrounding the collapse of the housing market for the purpose of

determining whether BSRM was truthful when it represented to Plaintiff

in May of 2006, that the value of Plaintiff's home was $1,100,000 (the

"investigation").The investigation included, for example: (i) review and

analysis of media reports, congressional testimony and additional

material; (ii) review and analysis of court filings cited herein; (iii)

examination of the SEC filings, press releases and other public statements of Bear Stearns & Co., Inc.; (iv) analysis of academic and industry studies regarding the performance history of traditional mortgages, Alt-A mortgages, subprime mortgages and complex mortgages  from 2001-2007; and (v) numerous additional documents some of which are cited herein. Many of the facts related to Plaintiff's allegations are known only by the Defendants named herein, or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

55. While the above investigation was on-going, Plaintiff, on May 2, 2011, received a letter from EMC dated April 29, 2011, stating that Plaintiff had been approved for loan modification. In response to this letter, Plaintiff faxed a 9 page response letter on May 20, 2011 to loss mitigation; a re-fax of the same response letter was sent on June 8, 2011 to loss mitigation after being told they had not received the first fax transmission, and a fax of the same response letter on July 13, 2011 to the payroll research department. In the response letter, Plaintiff stated that she believed she was the victim of a fraud perpetrated by BSRM and the other Bear Stearns Entities, and in light of this belief, she was rejecting

34

the loan modification offer made on May 2, 2011 because she believed, based on the partial investigative findings of her husband, attorney George Spizzirri, that she had been the victim of a fraud perpetrated by the JPMorgan Defendants and she intended to redress these wrongs by instituting a lawsuit based on fraud and misrepresentation against the JPMorgan Defendants. Plaintiff further stated that in lieu of filing a lawsuit, she was willing to settle the matter pursuant to a loan modification agreement in which the principal balances on the two mortgages was reduced to 80% of the fair market value of the underlying property. The 9 page response letter set forth some of the facts and circumstances surrounding the loan originations along with a brief summary of the partial findings derived from the on-going investigation as of the date of the fax response.

56. The matter dragged on for several months without receiving an official response from Defendant EMC. . However, on January 8, 2012, Plaintiff received a letter dated January 5, 2012 from the Chase Home Lending Executive Office stating that they had received a request from Plaintiff on January 3, 2012 and they expected to have an answer or status update for Plaintiff by January 18, 2012.

57. On January 15, 2012, Plaintiff received a second letter from the Chase Home Lending Executive Office stating that they were writing to follow up on Plaintiff's request and inform Plaintiff that they needed until January 28, 2012 to conduct additional research into Plaintiff's request or inquiry.

58. On January 30, 2012, Plaintiff's attorney received a call from the Chase Home Lending Executive Office informing Plaintiff's attorney that a decision had been reached with regard to the 9-page letter and that decision would be forthcoming in writing detailing the decision and the reasons for the decision.

59. On  February 6, 2012, Plaintiff's attorney served a written notice of rescission upon  Defendant JPMORGAN Chase as successor-in-interest to all of the Bear Stearns Entities including BSRM, stating Plaintiff's willingness to execute a deed in lieu of foreclosure on the underlying property in exchange for Defendant JPMORGAN Chase s making restitution to plaintiff of the following losses suffered as a result of the Defendants fraudulent conduct: (i) Plaintiff's equity investment made in purchasing the underlying property; (ii) Plaintiff's capital improvements made to the underlying property; and (iii) Plaintiff mortgage payments,

property taxes, repairs, maintenance and HOA fees paid in excess of the fair market rental value of the underlying property.

60. On February 10, 2012, Plaintiff received formal written notice from Chase Home Lending Executive Office informing Plaintiff that Plaintiff's offer of settlement was rejected.

## THE INVESTIGATION

## I. Mortgage Types

61. The U.S. residential mortgage market is estimated to include 54.7 million loans with a value of approximately $10 trillion. For first-lien mortgages, these loans can generally be delineated into (1) prime, (2) Alt-A (near-prime), (3) subprime mortgages, and (4) Alt-B complex mortgages. Prime mortgages are referred to in the mortgage industry as "traditional mortgages." Subprime mortgages, Alt-A mortgages, and Alt-B complex mortgages, are collectively referred to in the mortgage industry as "nontraditional mortgages." This terminology shall be followed in this Third Amended Complaint.

### A. Prime Mortgages

62. Prime mortgages are made to borrowers with good credit histories, good repayment prospects, and above-minimum down payments. "Loosely speaking," there are two categories of prime loans; (i) Conforming

mortgages are backed implicitly or explicitly by the Federal Government. These loans are offered to prime borrowers who conform to underwriting standards set by the government sponsored agencies such as FHA, VA, Fannie May or Freddie-Mac (the "agencies").  (ii)  Non-conforming mortgages (called Jumbo asset class loans), carry no implicit or explicit government guarantee. Non-conforming loans are offered to prime borrowers with an original principal loan balance larger than the conforming limits imposed on the agencies by Congress. The prime market is the largest component of the residential mortgage market, accounting for about two-thirds of all lending. Over three quarters of these loans have a fixed interest rate or an adjustable interest rate which is fully amortizing over the life of the loan or a combination of a fixed interest rate for a portion of the loan and adjustable interest rate for the balance, both of which are fully amortizing. Useful sources for the characteristics of conforming prime mortgages are the $4.1 trillion in loans securitized by Fannie Mae and Freddie Mac (Agency MBS). For Freddie Mac, as of year-end 2007, the average original loan-to-value (LTV) ratio was 71 percent and the average FICO score was 723. For Fannie Mae, these figures were similar -- 72 percent original LTV and 721 FICO.

### B. Near-Prime (Alt-A) Mortgages

63. Near-prime loans, sometimes called Alt-A loans, are typically made to borrowers with good credit histories, but contain some one or more other risk factors such as low documentation, a high loan-to value ratio, a nontraditional amortization schedule, or a property that is not occupied by the owner. Among loans in Alt-A deals that originated in 2005 and 2006, the average FICO score was about 710, the average loan size was about $303,000 and more than half were used for the purchase of a home. However, only 26 percent of the loans were fully documented, almost 39 percent were interest-only loans, and 23 percent allowed for negative amortization.

### C. Subprime Mortgages

64. A subprime mortgage is one made to a borrower with a poor credit history (e.g., a FICO score below 620) and/or with a high leverage as measured by either the debt-to-income ratio or the loan-to-value ratio). This market is estimated to encompass 6.7 million loans with a total value of about $1.2 trillion. More than half of subprime mortgages (by number or value) have an adjustable rate. Subprime adjustable-rate loans typically have an initial period of 2-3 years of fixed payments followed by variable payments thereafter (the so-called 2/28 and 3/27 mortgages). Starting around 2002, the subprime market grew dramatically, before

declining in 2007. These loans are indeed made to risky borrowers: the average credit score is only 621 and over 90 percent of borrowers have FICO scores below 700. Two-thirds of the mortgages include full documentation of the information in the loan application. Prepayment penalties are observed for about 73 percent of the subprime mortgages and the average term of the prepayment penalty is 30 months. It is estimated that almost 20 percent of subprime mortgages were "potentially prime", that is, fully documented, property occupied by the owner, originated with an LTV below 80 percent, and a FICO scores of at least 620.

**D. Alt-B Complex Mortgages**

65. Alt-B complex mortgages became a popular borrowing instrument during the bullish housing market of the early 2000's but vanished rapidly during the subsequent downturn. These non-traditional loans (interest only, negative amortization, and teaser mortgages) enable households to postpone loan repayment compared to traditional mortgages and hence relax borrowing constraints. Studies show that Alt-B complex mortgages (i) are geographically concentrated in areas of high house price levels and past appreciation, and (ii) were chosen by prime borrowers with high income levels seeking to purchase expensive houses relative to their

incomes. It should be noted that the demarcation between Alt-A and subprime loans has been blurred. Over time Alt-A has expanded to include loans with progressively less documentation and lower borrower credit scores. At the same time, subprime loans have, on average experienced a slow but steady rise in average credit scores. A result of this convergence has been the creation of the so-called Alt-B sector, where loans using this nomenclature were securitized in 2004.

## II. Mortgage-Backed Securities (MBS)

66. Since the 1970s, the principal structural change in the mortgage market has been the use of securitization. Prior to this, mortgages were retained by banks in their portfolios until they matured or were paid off. Securitization is a process by which mortgages (typically a large pool of mortgages) are used as collateral to issue securities, also known as mortgage-backed securities (MBS). Some mortgage securities are backed implicitly or explicitly by the U.S. government and are commonly called *agency* MBS. Such origination of mortgages and issuance of MBS is dominated by loans to *prime* borrowers conforming to underwriting standards set by the government sponsored agencies. Non-agency MBS issuance can be split into four broad categories—Jumbo, Alt-A, subprime, and complex. Both agency and non-agency jumbo mortgages

constitute the prime mortgage market of high-credit-quality borrowers, while the non-prime segment comprises subprime, Alt-A and complex mortgages.

## III.    The Securitization Process

67. The most common form of securitization of mortgage loans involves a sponsor or seller – the entity that acquires or originates the mortgage loans and initiates the securitization – and the creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage loans. The trust is established pursuant to a pooling and servicing agreement entered into by, among others, the "depositor" for that securitization. In many instances, the transfer of assets to a trust "is a two-step process: the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions." Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

68. Residential MBS are backed by the underlying mortgage loans. Some residential MBS are created from more than one cohort of loans called collateral groups, in which case the trust issues securities backed by

42

different groups of mortgage loans. For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group. Purchasers of the securities acquire an ownership interest in the assets of the trust, which in turn owns the loans. Within this framework, the purchasers of the securities acquire rights to the cash-flows from the designated mortgage group, such as homeowners' payments of principal and interest on the mortgage loans held by the related trust.

69. Residential MBS are issued pursuant to registration statements filed with the SEC. These registration statements include prospectuses, which explain the general structure of the investment, and prospectus supplements, which contain statistical summaries of the collateral groups and entire portfolio of mortgage loans in each Securitization, such as the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges. In addition, the registration statements contain statements about the origination and underwriting practices used to make and approve the loans. Certificates are issued by the trust pursuant to the registration statement and the prospectus and prospectus supplement. Underwriters sell the certificates to investors.

70. A mortgage servicer is necessary to manage the collection of proceeds from the mortgage loans. A servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee. The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance.  A servicer is required to report key information about the loans to the trustee. The trustee (or trust administrator) administers the trust's funds and delivers payments due each month on the certificates to the investors.

71. A credit rating agency is necessary for many major investors such as pension funds, municipalities, insurance companies, and university endowments. These institutions have relied heavily on credit ratings to assist them in distinguishing between safe and risky investments.  Credit ratings agencies such as Moody's, Standard and Poor and Fitch play an essential role for investors in the securitization process by gauging the risk of an investment.  Each credit rating agency uses its own scale with letter designations to describe the various levels of risk.  In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments.  In the period 2005-2007,

44

investments with AAA or its equivalent, historically experienced a loss rate of less than 0.05 percent. Investments with a BBB rating, or its equivalent, historically experienced a loss rate of less than 1.00 percent. As a result, securities with credit ratings between AAA or its equivalent, through BBB or its equivalent, were generally referred to as being of "investment grade" quality. C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for recovery.  In making a rating, rating agencies rely on the quality of the data generated about the loans going into the securitizations. ***During the period 2005-2007, this data was produced by the sponsor and reported to the credit rating agency and investors. The credit rating agencies or investors do not receive the original loan files for the loans in the pool.  Those files are reviewed by the arranger or sponsor of the transaction, who is also responsible for reporting accurate information about the loans in the deal documents and offering documents to potential investors, but retained by the servicer.*** Senate Homeland Security and Governmental Affairs Subcommittee on Investigations, Hearing on Wall Street and the Financial Crisis: The Role of Credit Rating Agencies, Apr. 23, 2010 (emphasis added).

72. Bond insurance (also known as "financial guaranty insurance") is a type of insurance whereby an insurance company guarantees scheduled payments of interest and principal on a bond or security in the event of a payment default by the issuer of the bond or security. As compensation for its insurance, the insurer is paid a premium (as a lump sum or in installments) by the issuer or owner of the security to be insured. Bond insurance is a form of "credit enhancement." The premium requested for insurance on a bond is a measure of the perceived risk of failure of the issuer. Insured securities range from municipal bonds and infrastructure bonds to asset-backed securities ("ABS"), such as residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") domestically and abroad. As was the general practice for asset-backed securities, the issuer and the bond insurer assumed risk and undertook due diligence consistent with their respective roles in the Transactions. The issuer assumes the *risk* and the burden of assessing the validity of the attributes of the mortgage loans in the pool, including that the loans were originated pursuant to the appropriate underwriting guidelines and were not fraudulently procured.  The bond insurer bears the market risk and the burden of evaluating whether loans bearing the

46

attributes represented by the issuer would perform after the closing of the Transactions.

## IV.    The Market for Mortgage-Backed Securities

73. Over the years, this market has grown significantly and evolved with an increased level of investor sponsorship.  Between 2001 and 2006, however, there was dramatic growth in non-agency loan originations and securitizations. According to *Inside Mortgage Finance* (2007), in 2001, agency originations were $1.433 trillion and securitizations were $1.087 trillion – far outpacing non-agency originations of $680 billion and securitizations of $240 billion. In 2006, agency originations grew to $1.040 trillion while securitizations declined to $904 million. However, in that same period, non-agency originations had grown 100% to $1.480 trillion, and non-agency securitizations had grown 330% to $1.033 trillion in 2006. Further, non-agency origination of subprime loans grew 315% – from $190 billion in 2001 to $600 billion in 2006; and non-agency Alt-A origination grew 566% – from $60 billion in 2001 to $400 billion in 2006. Non-agency securitizations of subprime loans had also grown 415% – from $87.1 billion in 2001 to $448 billion in 2006. In short, in 2005 and 2006, MBS securities were dominated by the securitization of non-traditional mortgages.

47

74. The market for adjustable rate mortgages ("ARMs") that involved interest-only and negative amortization loans (complex mortgages), grew concurrently with the boom in subprime and Alt-A loan originations and securitizations. ARMs increased from $355 billion in 2001 to $1.3 trillion in 2006. *Mortgage Market Statistical Annual* (2007, Vol. 1, p. 4). Such growth coincided with the increase in popularity of so called "exotic" or non-traditional ARMs which had fixed interest rates for a limited period before "resetting" during the life of the loan to significantly higher adjustable rates. These non-traditional ARMs included "2/28, or 3/27 ARMs" (many with below-market teaser rates for two to five years and then conversion to the fully-indexed rate); interest-only ARMs (permitting interest-only payments for a set period of time during which the rate may fluctuate, resulting in negative amortization and rising principal); option payment ARMs (offering up to four payment options, including minimum and interest-only payments, which, if chosen, result in negative amortization and rising principal); and 40-year ARMs (in which payments are calculated based on a 40-year payment term but where the loan terminates in 30 years, resulting in a final balloon payment). Origination of non-traditional ARMs are deemed to be classified as types of mortgage loans within the nontraditional category

48

as defined above) increased 278% between 2004 and 2006 – from $205 billion to $775 billion. *Mortgage Market Statistical Annual* (2007, Vol. 1, p. 6).

75. Non-traditional adjustable mortgages, interest-only and negative amortization loans presented the greatest potential for "payment shock" to the borrower since they provided for initially small monthly payments based on low fixed rates which then reset thereafter to significantly higher monthly payment amounts based on adjustable interest rates. Specifically, these loans permitted the borrower to pay less than even the full monthly interest payment with the unpaid interest being added back on top of the outstanding principal balance. These small payments were permitted only until the loan's Loan-To-Value ("LTV") ratio (which initially was around 80%) reached approximately 110%. At that point, the loan "reset," requiring the borrower to make monthly payments based on significantly higher adjustable rates and outstanding principal. While this type of loan was designed for special types of borrowers (professionals and high net worth investors), Originators routinely sold these loans to unsophisticated borrowers who were unable to make the required payments after the loan reset.

**V. The Bear Stearns Entities**

76. The Bear Stearns Companies, Inc. (BSI) was a global <u>investment bank</u> and <u>securities</u> trading and <u>brokerage</u>, until its collapse and <u>fire sale</u> to <u>JPMorgan Chase</u> in 2008.  BSI's main business areas, based on 2006 net revenue distributions, were <u>capital markets</u> (equities, fixed income, investment banking; just under 80%), <u>wealth management</u> (under 10%), and global <u>clearing</u> services (12%). Mortgage securitization was the biggest piece of Bear Stearns's most-profitable division, its fixed-income business, which generated 45% of the firm's total revenues. Growing fast was the Global Client Services division, which included Bear's prime brokerage operation. Bear Stearns was the second-biggest prime broker in the country, with a 21% market share in 2006, trailing Morgan Stanley's 23%.

77. From 2001-2007, the Bear Stearns Entities, acting in concert with each other and under the direction of the parent company, BSI (now JPMORGAN Chase as successor-in-interest to BSI) specialized in originating, acquiring, pooling, securitizing, selling and servicing nontraditional mortgages.

78. In mortgage securitization, Bear Stearns followed a vertically integrated model that made money at every step, from loan origination through securitization, sale and servicing. It both acquired and created its own

captive originators to generate mortgages that Bear Stearns bundled, turned into securities, and sold to investors. The smallest of the five large investment banks, it was still a top-three underwriter of private-label mortgage–backed securities from 2000 to 2007. In 2006, it underwrote $36 billion in collateralized debt obligations of all kinds, more than double its 2005 figure of $14.5 billion.

79. Bear Stearns controlled every link in the mortgage-loan-securitization chain, including (i) the origination, and financing of the loans that provided the cash flow for the mortgage-backed securities, (ii) the "warehousing" or temporary financing of large pools of loans pending their pooling and securitization into mortgage-backed securities, (iii) the underwriting, offering, and sale of the mortgage-backed securities, included to funds managed by its affiliates, and (iv) the servicing of loan pools to ensure the continued payment of principal and interest needed to make payments under the mortgage-backed securities (referred to hereafter as the "securitization process"). As the parent company, BSI reported in its 2006 Annual Report, this "vertically integrated franchise allows us access to every step of the mortgage process, including origination, securitization, distribution and servicing." BSI and the Subsidiaries that implemented each of these components of the mortgage

securitization process were directed and controlled by the senior

executives and traders sitting in New York, and shared common board

members, executives, systems, and resources.

80. BSI used the offices of EMC in Texas to house its mortgage-loan

"conduit" that generated the flow of loans into the securitization pipeline

from which the mortgaged-backed securities issued. Mary Haggerty, who

was the Senior Managing Director responsible for the conduit's creation

in 2001, explained that the EMC conduit acquired mortgage loans for

securitization and not to hold in inventory: "[I]f you think of a pipe,

water comes in and water goes out as opposed to a pipe leading to a

reservoir that's going to be held." EMC thus supplied the Bear Stearns

securitization machine with mortgage loans that Bear Stearns had no

intention of ever holding in its own inventory.

81. EMC guided the flow of loans through the pipeline by (i) acquiring and

aggregating the mortgage loans to be securitized, (ii) sponsoring the

securitizations by selling loan pools to the trusts that issued the securities,

and (iii) acting as "servicer" for a large number of the securitized loans,

with, among other things, the obligation to collect amounts from the

borrowers for the benefit of the trusts. Moreover, EMC also purported to

undertake pre- and post-acquisitions reviews and implement other controls to ensure the quality of the loans acquired.

82. EMC obtained a portion of the loans for securitization from its originator affiliates Bear Stearns Residential Mortgage Corporation (previously, "BSRM") and EMC Residential Corporation (previously, "EMCRC") (collectively, the "Bear Stearns Originators"). From the "Bear Stearns Originators, the Bear Stearns Entities generated an enormous volume of residential mortgage loans that it financed, purchased and originated, "with the ultimate strategy of securitization into an array of Bear Stearns' securitizations."

83. In addition to the Bear Stearns Originators, the Bear Stearns Entities, acting through EMC, acquired for securitization loans that were purchased from large third-party originators (previously, the third-party originators and the Bear Stearns Originators are collectively referred to herein as the "Originator(s)").

84. The Bear Stearns Entities offered an advance line of funds available to Originators to maintain the constant stream of loans acquired by EMC for securitization and reminding the Originators that it would pay premium pricing on any loans originated and sold to EMC. Because the Originators were not lending their own funds, the Bear Stearns Entities

encouraged and enabled them to originate a continuous flow of loans, thereby providing the Originators with the means by which to approve and generate thousands of mortgages.

85. The Bear Stearns Entities leveraged its Originators to dictate loan-origination standards for the loans it securitized, either by requiring that loans be originated to its published guidelines or by approving the guidelines used by its larger originators, with whatever changes the Bear Stearns Entities believed were necessary. But, the Bear Stearns Entities abandoned the protocols necessary to ensure adherence to those guidelines.

86. BSC, for its part, acted as lead underwriter and designated its employees as the deal managers to broker the EMC-sponsored securities offerings. It solicited the rating agencies to rate, financial guarantors to insure, and investors to purchase these mortgage-backed securities. Thus i) worked with EMC to structure the Transactions, (ii) took the lead in coordinating the flow of documents and information among the rating agencies and parties to the Transactions, (iii) purchased the mortgage-backed securities issued in the Transactions (the "Notes") on a firm commitment basis pursuant to written agreements with the Depositor, and (iv) offered and sold the Notes to investors. BSC also made the decisions on the volume

54

of securitizations to effectuate, and, likewise, the volume of loans being acquired by the conduit was "highly controlled by the trading desk." And, as discussed further below, BSC executives made decisions regarding the due diligence, quality control, and repurchase protocols to be followed (or not followed) by EMC in relation to the securitized loans.

87. The Bear Stearns Entities also frequently purchased or retained a financial interest in a portion of the securities issued in these transactions, which it often repackaged into securities known as "collateralized debt obligations" ("CDOs"). Moreover, then a Senior Managing Director of Bear, Stearns & Co., Ralph Cioffi helped create both the supply and demand for the securitizations, soliciting insurers and investors to participate in its transactions, and then purchasing the securities issued for the investment funds he managed through Bear Stearns affiliates, including Bear Stearns Asset Management. Finally, the Bear Stearns Entities provided financial research for residential mortgage-backed securities and related structured products that it created and sold.

88. The Bear Stearns Entities recorded gains and earned fees at every step in this chain: (i) loan-origination fees, (ii) gains on sale of the mortgages to the securitization trusts, (iii) fees from underwriting mortgage-backed securities, (iv) fees from servicing of the securitized loans, (v) fees from

CDOs into which these securities were repackaged, (vi) gains and fees from trading in these securities and interests in the CDOs into which they were placed, and (vii) management fees and carried interests from hedge funds and other investment vehicles that invested in the vast array of securities and financial products structured by the Bear Stearns Entities and its affiliates that ultimately were backed by residential mortgage loans. But perhaps the greatest benefit from these fees flowed to the senior executives and traders, who obtained obscene compensation by putting at risk the Bear Stearns Entities ongoing wherewithal.

## VI.    The Bear Stearns Securitizations Machine

89. Up until 2001, BSI had a reputation as being a leader in all facets of mortgage-loan securitization, at or near the top of the charts for issuance and underwriting of mortgage-backed securities for years running. BSI built this once-stellar reputation on the securitization of large, high-quality "jumbo prime," loans which it maintained until it formed the mortgage-loan conduit at EMC in 2001. The new conduit initially focused on the securitization of "Alt-A" loans, which were made to borrowers that were generally considered more risky than prime borrowers. The profits from the securitizations grew year after year, but took off in 2003, when the Bear Stearns Entities began to securitize

56

"subprime" mortgage loans, which it never squarely defined, but that generally constitute loans issued to borrowers with limited incomes or relatively low FICO credit scores due to poor credit history. Finally, with the formation of BSRM, the Bear Stearns Entities in 2005 began to specialize in the securitization of complex mortgages.

90. From 2003 to 2006, BSI revenue and profit increased by 123.8% and 77.6%, respectively, driven in large part by mortgage finance and its securitization machine. For 2006, the BSI overall securitization volume rose to $113 billion from $95 billion in fiscal 2005, amounting to 11% of the overall U.S. mortgage-securities market. Consistently, the volume of EMC's securitizations grew markedly over the same period. In 2003, EMC securitized 86,000 loans valued at approximately $20 billion. That number nearly tripled in 2004 to 230,000 loans valued at $48 billion. In 2005, the number jumped to 389,000 loans valued at nearly $75 billion. And in 2006, EMC securitized over 345,000 loans valued at $69 billion. All told, from 2003 to 2007, EMC purchased and securitized more than one million mortgage loans originally valued in excess of $212 billion.

91. The Bear Stearns Entities achieved the dramatic growth in its securitization volume by (i) obtaining an ever-increasing supply of

mortgage loans for its securitizations from the Originators while (ii) maintaining the demand for the securities backed by those loans.

92. Having already moved from the prime into the Alt A, and subprime markets, in 2005, the Bear Stearns Entities further extended the reach of its mortgage portfolio by expanding its use of "reduced documentation" or "no documentation" loan programs. While these programs bear various names (*e.g.*, "Stated Income," "No Ratio," "Stated Income Stated Asset," or "SISA"), they share the common characteristic of requiring less documentation from the borrower than traditional full-documentation loan programs. Accordingly, the reduced-or no-documentation programs were designed to be offered only to certain types of pre-qualified borrowers (*e.g.*, self-employed individuals with very strong credit and substantial equity in the mortgaged property), and the originators supplying the loans were required to use alternative means of assessing the borrowers' ability to repay the loans. However, over time, the Bear Stearns Entities and its stable of Originators expanded these programs to riskier categories of borrowers in order to increase loan volume.

93. In addition to the expanded use of the reduced-documentation programs, to keep the pipeline full, EMC added second-lien loans and home-equity lines of credit ("HELOCs") to its portfolio of mortgage products.

HELOCs provide borrowers with a revolving line of credit that is generally secured by a secondary lien on the property.  EMC's HELOC business began in 2005 with over 9,300 HELOCs valued at more than $509 million and grew to more than 18,000 HELOCs valued at over $1.2 billion by the end of 2006. The growth in its second-lien business was meteoric, with volume skyrocketing from approximately 15,000 loans valued at approximately $660 million at the end of 2004 to approximately 116,500 loans valued at approximately $6.7 billion at the end of 2006.

94. Starting in early 2008, delinquencies, defaults and foreclosures on the nontraditional mortgages originated and acquired for securitization by financial institutions including the Bear Stearns Entities during the period 2005-2007, began to rise dramatically. By late 2008, foreclosures sales had increased to such a degree that the increase in the supply of homes from foreclosure sales negatively impacted the housing market, causing home prices to dramatically fall, and setting in motion a vicious downward spiral that led over the next 3 years to what is now being called, the Great Recession. And, as a result of the above surge in delinquencies, defaults and foreclosures, the Bear Stearns Entities in 2008 collapsed and in March of 2008, BSI was forced to merge with

JPMorgan Chase pursuant to fire-sale terms. After the Merger, rating agencies, bond insurers, investors and borrowers began to discover what the Bear Stearns Entities had known in May of 2006; namely, that in 2005,  in an effort to expand loan volume, the Bear Stearns Entities, under the interest, ownership, direction and control of their parent corporation, BSI, conspired and agreed with the other Bear Stearns Entities to conceal from their investors, bond insurers, credit rating agencies, shareholders, SEC regulators, and borrowers including Plaintiff, certain "material facts" that, *inter alia*, negatively impacted the represented value, at origination, of the collateral supporting the nontraditional mortgages originated and acquired for securitization.

95. Each Bear Stearns Entity played an important role in the business scheme that involved one or more of the following securitization processes; originating nontraditional mortgages, acquiring nontraditional mortgages from third party originators, pooling the nontraditional mortgages originated and acquired, structuring the securitizations of these mortgages, selling the mortgage loans to the depositor who would transfer these mortgages to one or more trusts created for the benefit of Certificate-holders, underwriting the public offering of the Certificates,

issuing the Certificates, and marketing and selling Certificates backed by these mortgages to investors.

96. Although the role each Entity played in the business scheme differed from the other Bear Stearns Entities, there was a role they played that was common to each of them and it was this common role that made their business scheme fraudulent; namely, (i) each Entity concealed material facts from persons the Entity was under a legal duty to disclose such material facts to; (ii) each Entity knew that the other Entities were concealing material facts from persons they were under a duty to disclose such material facts to;  (iii) each Entity knew that the concealment of material facts by the other Entities constituted a breach of duty by the other Entity, and knowing this, each Entity gave substantial assistance and encouragement to the other Entities to breach their respective duties, and (iv) as a consequence of giving substantial assistance to the other Entities in breaching their respective duties, the conduct of each Entity, separately considered, constituted a breach of duty to all of the persons who had a legal right to have such material facts disclosed to them by the other Entities; namely,  credit rating agencies, bond insurers, investors, shareholders, security regulators and borrowers including Plaintiff.

## VII.   The Concealed Material Facts

### A. Mortgage Modeling: the Loan-Level Data, Performance History and Housing Prices

97. From 2001 through 2007, the Bear Stearns Entities, acting through EMC, retained the servicing rights on hundreds of thousands of nontraditional mortgages originated and acquired for securitization. By utilizing significant advances in methodology and computational power developed over the prior decade, the Bear Stearns risk management teams had the ability to model and analyze the loan level data in relation to their performance histories and correlate this data with changes in housing prices for the purpose of quantifying the expected probability of loss for (i) the mortgages under service and (ii) new mortgages to be originated and acquired for future securitizations. In short, the ability to model and quantify the riskiness of existing and future nontraditional mortgage loans based on   delinquency, default and foreclosure rates over time in the context of changing housing prices.

### B. Bear Stearns Deficient and Outmoded Mortgage Models

98. However, the mortgage valuation model Bear Stearns used failed to incorporate data about risk of default, and did not account for key factors such as changes in housing prices. As a result, the Bear Stearns model

was by design, deficient and outmoded. Bear Stearns chose to use this

outmoded and deficient model  in order to conceal from investors, bond

insurers, credit rating agencies, shareholders, independent appraisers and

borrowers including Plaintiff, the findings and conclusions as set forth

below that would have resulted from use of a mortgage valuation model

in which risk of default and changing housing prices were incorporated;

namely, (i) the fact that their subprime mortgages originated in

compliance with their originators stated underwriting standards and

guidelines were extremely high risk; so high risk that  one out of five

subprime mortgages originated in May of 2004 thru May of 2006 would

likely end in foreclosure by the end of 2008, (ii) the fact that  a

significant percentage of the nontraditional mortgages originated and

acquired for securitization were "defective;" that is, a significant

percentage of nontraditional mortgages  were not originated in

compliance with the stated underwriting standards and guidelines of the

Bear Stearns originators, thereby further increasing the risk of default and

foreclosure for the already high risk subprime mortgages and

substantially increasing the risk of default and foreclosure on Alt-A and

Alt-B nontraditional mortgages acquired by Bear Stearns for

securitization to a significantly high level; and (iii) the fact that the Bear

63

Stearns third party originators sold millions of defective nontraditional mortgages to other securitizers, thereby increasing the risk that a significant percentage of nontraditional originated (more than 1 out of 5 subprime mortgages) between May of 2004 and May of 2006 would end in foreclosure by the end of 2008.

### C. The High Risk Subprime Mortgages

99. Notwithstanding the above, the raw unanalyzed loan-level data and the performance history associated with that data – data Plaintiff will be seeking through discovery -- was provided to First American LoanPerformance, a subsidiary of First American CoreLogic, Inc., pursuant to contractual arrangement with Bear Stearns. LoanPerformance has been acquiring this kind of data from loan servicers since 1999. The data contain extensive information on the characteristics of each securitized loan such as the mortgage type, the interest rate, the loan purpose (purchase or refinance), prepayment penalty, borrower FICO credit score, and reported debt-to-income ratio and the extent to which that income is documented (the "loan-level data" or loan-level characteristics), together with the payment history associated with each loan starting with the origination date ("performance history"). LoanPerformance captured around 90 percent of the securitized subprime

market from 1999 to 2002 and nearly all of the market from 2003 to 2007. LoanPerformance licenses this data to interested third parties for a fee. However, the cost of licensing this data is extremely costly. Plaintiff was informed by LoanPerformance that the Bear Stearns securitization data would cost Plaintiff in excess of $100,000; an amount that is well in excess of the financial capabilities of the Plaintiff.

## 1. Evidence supporting the high Risk Character of Subprime Mortgages

100.   Utilizing the LoanPerformance data, numerous academic and industry led studies have been conducted. One study that is of particular relevance was sponsored by the ***Center for Responsible Lending***. In a Report dated ***December 2006*** and entitled, ***Losing Ground: Foreclosures in the Subprime Markets and Their Cost to Homeowners,*** the Report researched how homeowners  fared with subprime mortgages. Analyzing the performance histories of more than six million subprime mortgages originated from 1998 through the third quarter of 2006 (**including all of the Bear Stearns subprime securitizations**) and taking into account changes in housing prices, the Report made the following primary findings**:**

(i) Even during the recent period of strong housing appreciation (2000-2005), subprime foreclosures have been high. As many as one in eight (13 percent) subprime home loans ended in foreclosure within five years of origination.

(ii) The past housing boom masked the high proportion of homeowners who have struggled with subprime loans. For many borrowers, strong house price growth increased the amount of equity in their homes and enabled them to refinance their mortgages despite being behind on the monthly payments. When these distressed prepayments are added to the foreclosure rates, the total "failure rate" for subprime loans approaches 25 percent.

(iii)       As housing prices decline, subprime foreclosures will rise. And with housing prices cooling in 2006, fewer delinquent borrowers will have the equity needed to refinance their loan or sell their home to avoid foreclosure. Our results confirm that foreclosures are more likely in housing markets with lower house price growth.

(iv)       The chance of foreclosure on a subprime loan doubled between 2002 and 2005. Subprime loans originated in 2002 have a one-in-ten lifetime chance of foreclosing. For loans originated in 2005 and 2006, the probability shoots up to one in five.

66

(v)      Multiple subprime loans boost foreclosure risk even higher. Lenders often portray subprime loans as a stepping-stone to a prime loan. In reality, many borrowers in the subprime market refinance from one subprime loan to another, losing equity each time to cover the cost of getting a new loan. When the likelihood of foreclosure for borrowers who repeatedly refinance is analyzed, the Report concludes that the risk of losing the home climbs to 36 percent.

(vi)      The report concludes, based on the six million securitized subprime loans under analysis including the Bear Stearns subprime loans, as follows: (i) that  one out of five (19 percent) subprime mortgages originated in September of 2004 thru September of 2006 will end in foreclosure, and that by the end of 2008, 2.2 million borrowers will lose their homes and up to $164 billion of wealth in the process; and (ii) that many loan level features of typical subprime loans substantially increase the risk of foreclosure, regardless of the borrower's credit history.

101.   Given the fact that all of the securitized Bear Stearns subprime mortgages were included in the six million loans analyzed, it seem reasonable to conclude that had the ***Center for Responsible Lending*** conducted a separate analysis of the Bear Stearns subprime

securitizations and compared the two studies, the Center would have minimally concluded that nineteen percent (19%) of the subprime mortgages originated and acquired by Bear Stearns for securitization in September of 2004 through September of 2006 would end in foreclosure by the end of 2008.

### D. The Systematic Disregard of Underwriting Standards

102.   There is, however, substantial evidence to support the belief that the analysis of subprime loans originated and acquired by Bear Stearns for securitization from September of 2004 through September of 2006 would show a significantly greater percentage of foreclosures by the end of 2008 than the 19% projected by the *Center for Responsible Lending* for all subprime mortgages.   The reason is as follows: the Bear Stearns originators, with the knowledge, encouragement, support and assistance of the Bear Stearns Entities, significantly and substantially increased the risk of foreclosure on all mortgages originated and acquired during the above time framework by (i) systematically disregarding stated underwriting standards regarding income and employment; (ii) regularly making exceptions to their underwriting guidelines in the absence of sufficient compensating factors; (iii) falsifying loan-to-value ratios with inflated appraisals; (iv) underwriting a dangerously high percentage of

mortgages for borrowers who did not intend to occupy the property they were purchasing, and (v) concealing these facts and actively preventing investors, bond insurers, credit rating agencies, shareholders, independent appraisers and borrowers including Plaintiff, from discovering these facts.

### E. The Evidence Supporting the Systematic Disregard of Underwriting Standards and Guidelines

#### 1. The Bear Stearns Lawsuits

103.   Since the collapse of Bear Stearns in March of 2008 and the subsequent Merger of JPMorgan Chase and Bear Stearns, a number of lawsuits have been filed against one or more of the JPMorgan Defendants as successor-in-interest to BSI and its Subsidiaries involving a variety of federal and state securities violations and allegations of fraud and negligence regarding nontraditional mortgages originated and acquired by Bear Stearns for securitization in 2005-2007.

104.   In several of these cases, the Plaintiff's commissioned forensic experts to conduct studies based on statistical analyses of loan-level data to show whether the Registration  Statement for each Bear Stearns securitization misrepresented the degree of loss by (i) materially *overstating*  the percentage of loans in the Supporting Loan Groups that were owner

69

occupied,  (ii) materially *overstating* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, (iii) materially *understating* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent,  and (iv) materially misrepresenting borrower income, employment, and assets.  It should be noted that in each of these studies statistical analysis was made because analyzing data for each Mortgage Loan in each Offering would have been cost-prohibitive and unnecessary. Statistical sampling is an accepted method of establishing reliable conclusions about broader data sets, and is routinely used by courts, government agencies, and private businesses. As the size of a sample increases, the reliability of its estimations of the total population's characteristics increases as well. Experts in RMBS cases have found that a sample size of just 400 loans can provide statistically significant data, regardless of the size of the actual loan pool, because it is unlikely that such a sample would yield results markedly different from results for the entire population.

### a.  False and Misleading Occupancy Data

105.   The Prospectus Supplements contained collateral group-level information about the occupancy status of the borrowers of the loans in the Securitizations.  Occupancy status refers to whether the property

securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property.  The Prospectus Supplements for each of the Securitizations presented this information in tabular form, usually in a table entitled "Occupancy Status of the Mortgage Loans." This table divided all the loans in the collateral group by occupancy status, *e.g.*, into the following categories:  (i) "Primary," or "Owner Occupied"; (ii) "Second Home," or "Secondary"; and (iii) "Investment" or "Non-Owner."  For each category, the table stated the number of loans in that category.  Occupancy statistics for the Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements.

106.    Information about the occupancy status is an important factor in determining the credit risk associated with a mortgage loan.  Because borrowers who reside in mortgaged properties are less likely to default and are more likely to care for their primary residence than borrowers who purchase homes as second homes or investments and live elsewhere, the percentage of loans in the collateral group of a securitization that are secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss. Even small

differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral group of a securitization can have a significant effect on the risk of loss.

107.   One such action involves the Government Sponsored Entities ("GSE's) Fannie Mae and Freddie Mac (***Federal Housing Finance Agency v JPMorgan Chase and Company, et al***). This action arises out of Defendants' actionable conduct in connection with the offer and sale of certain residential mortgage-backed securities to Fannie Mae and Freddie Mac (Fannie-Freddie case"). These securities were sold pursuant to registration statements, including prospectuses and prospectus supplements that formed part of those registration statements, which contained materially false or misleading statements and omissions. Defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the ability of the borrowers to repay their mortgage loans.

108.   In the studies conducted by forensic experts in the Fannie-Freddie case, for each Securitization, the sample consisted of 1,000 randomly selected loans per Supporting Loan Group, or all of the loans in the group if there were fewer than 1,000 loans in the Supporting Loan Group.  The

sample data confirmed, on a statistically-significant basis, that the data concerning owner occupancy was materially false and misleading. The data analysis revealed that the owner-occupancy statistics reported in the Prospectus Supplements were materially false and inflated.  In fact, far fewer underlying properties were occupied by their owners than disclosed in the Prospectus Supplements, and more correspondingly were held as second homes or investment properties.

109.   To determine whether a given borrower actually occupied the property as claimed, a number of tests were conducted by the FHFA's forensic experts, including, *inter alia*, (i) whether, months after the loan closed, the borrower's tax bill was being mailed to the property securing the mortgage loan or to a different address; (ii) whether the borrower had claimed a tax exemption on the property; and (iii) whether the mailing address of the property was reflected in the borrower's credit reports, tax records, or lien records.  Failing two or more of these tests was a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property, both of which make it much more likely that a borrower will not repay the loan.

110.   A significant number of the loans failed two or more of these tests, indicating that the owner occupancy statistics provided to Fannie Mae

and Freddie Mac investors were materially false and misleading.  The data analysis shows that for each Securitization, the Prospectus Supplement misrepresented the percentage of non-owner occupied properties.  The true percentage of non- owner occupied properties, as determined by the data analysis, versus the percentage stated in the Prospectus Supplement for each Securitization revealed that the Prospectus Supplements for the Bear Stearns Securitizations understated the percentage of non-owner occupied properties for the Supporting Loan Groups by an average of 9.77 percent.

111.   In another case entitled:  ***Allstate Bank et al., v JPMorgan Chase Bank, N.A. et al.,(“Allstate ”),*** plaintiffs alleged that Defendants' sold residential mortgage backed securities in the form of pass-through certificates (the "Certificates") to plaintiffs and that plaintiffs were made to believe they were buying highly-rated, safe securities backed by pools of loans with specifically-represented risk profiles. In fact, defendants knew the pool was a toxic mix of loans given to borrowers that could not afford the properties, and thus were highly likely to default. Like the Fannie-Freddie case, in the Allstate case, the Defendants made numerous material misrepresentations and omissions regarding the riskiness and

credit quality of the Certificates in registration statements, prospectuses, prospectus supplements, and other written materials.

112.   In the Allstate case, the plaintiffs' forensic experts selected a random sample of loans from each offering to test Bear Stearns' representations on a loan-level basis. Using techniques and methodologies that only recently became available, Allstate conducted loan-level analyses on nearly 26,809 mortgage loans underlying its Certificates, across 17 of the offerings at issue in that case. For each offering, Allstate attempted to analyze 800 defaulted loans and 800 randomly-sampled loans from within the collateral pool using investigative methods that were largely similar to the methods used in the Fannie-Freddie case; that is, tax records, credit records and property records. The results of Allstate's loan-level analysis of true owner-occupancy rates on the mortgage loans underlying the Bear Stearns Offerings showed that the Bear Stearns Defendants also misrepresented the percentages of owner occupied properties in its six securitizations from a low 7.44% to a high of 11.96% or an average of 9.72% per securitization.

b.   **False and Misleading Loan-to-Value Ratios**

113.   In the Fannie-Freddie case, the sample data referenced above also confirmed, on a statistically-significant basis, that the data concerning

loan-to-value was materially false and misleading in that it materially *overstated* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and materially *understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk of the GSE Certificates.

114.   The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made. The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan. Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

115.   The LTV ratio is among the most important measures of the risk of a mortgage loan, and thus, it is one of the most important indicators of the default risk of the mortgage loans underlying the Certificates.  The lower

the ratio, the less likely that a decline in the value of the property will wipe out an owner's equity, and thereby give an owner an incentive to stop making mortgage payments and abandon the property.  This ratio also predicts the severity of loss in the event of default.  The lower the LTV ratio, the greater the "equity cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

116.   Thus, LTV ratio is a material consideration to a reasonable investor in deciding whether to purchase a certificate in a securitization of mortgage loans.  Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate.

117.   The data analysis in Fannie-Fedddie further revealed that the LTV ratios disclosed in the Prospectus Supplements were materially false and understated. Specifically, for each of the sampled loans, an industry standard automated valuation model ("AVM") was used to calculate the value of the underlying property at the time the mortgage loan was

originated.  Retroactive AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review, and servicing.  Such AVMs rely upon similar data as appraisers—primarily county assessor records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.

118.   Applying the AVM to the available data for the properties securing the sampled loans shows that the retroactive appraised value given to such properties was significantly higher than the actual value of such properties.  The result of this overstatement of property values is a material understatement of LTV.  That is, if a property's true value is significantly less than the value used in the loan underwriting, then the loan represents a significantly higher percentage of the property's value.  This, of course, increases the risk a borrower will not repay the loan and the risk of greater losses in the event of a default

119.   For example, for the BSABS 2006-HE5 Securitization, which was sponsored by EMC and underwritten by BSC, the Prospectus Supplement stated that no LTV ratios for the Supporting Loan Group were above 100 percent. In fact, 16.95 percent of the sample of loans included in the data analysis had LTV ratios above 100 percent.  In addition, the Prospectus

78

Supplement stated that 68.40 percent of all loans had LTV ratios at or below 80 percent.  The data analysis indicated that only 39.78 percent of the loans had LTV ratios at or below 80 percent.

120.   The data analysis revealed that for each Bear Stearns Securitization, the Prospectus Supplement misrepresented both the percentage of loans with an LTV ratio that were above 100 percent and the percentage of loans that had an LTV ratio at or below 80 percent.  Table 8 below reflects (i) the true percentage of mortgages in the Supporting Loan Group with LTV ratios above 100 percent, versus the percentage reported in the Prospectus Supplement; and (ii) the true percentage of mortgages in the Supporting Loan Group with LTV ratios at or below 80 percent, versus the percentage reported in the Prospectus Supplement.  The percentages listed in Table 8 were calculated by aggregated principal balance.

**Table 8**

| Transaction | Tranche | Supporting Loan Group | Percentage of Loans Reported to Have LTV Ratios At Or Less Than 80% | True % of Loans in Sample With LTV Ratios At Or Less Than 80% Based on Data Analysis | Percentage of Loans Reported to Have LTV Ratios More Than 100% | True % of Loans in Sample With LTV Ratios Greater Than 100% Based Data Analysis |
|---|---|---|---|---|---|---|
| BSABS | IIA | Group II | 58.04 | 43.54 | 0.00 | 14.63 |
| BSABS | I2A | Group I-2 | 50.91 | 35.48 | 0.00 | 22.58 |
| BSABS | IIA | Group II | 50.24 | 41.35 | 0.00 | 11.53 |
| BSABS | IIA | Group II | 66.09 | 45.72 | 0.00 | 16.29 |
| BSABS | IIA | Group II | 52.23 | 40.68 | 0.00 | 16.95 |
| BSABS | II2A | Group II-2 | 58.48 | 37.56 | 0.00 | 18.92 |
| BSABS | II2A | Group II-2 | 59.19 | 38.94 | 0.00 | 14.60 |
| BSABS | IIA | Group II | 48.60 | 33.89 | 0.00 | 17.58 |
| BSABS | IIIA | Group III | 50.00 | 33.13 | 0.00 | 20.19 |
| BSABS | II2A | Group II-2 | 55.06 | 33.65 | 0.00 | 24.09 |
| BSABS | II3A | Group II-3 | 51.39 | 31.48 | 0.00 | 21.97 |
| BSABS | IIA | Group II | 36.55 | 27.16 | 0.00 | 21.34 |
| BSABS | II2A | Group II-2 | 54.46 | 33.98 | 0.00 | 23.71 |
| BSABS | II3A | Group II-3 | 52.89 | 31.21 | 0.00 | 21.71 |
| BSABS | II2A | Group II-2 | 39.16 | 18.82 | 0.00 | 27.06 |
| BSABS | II3A | Group II-3 | 35.32 | 19.49 | 0.00 | 32.78 |
| BSABS | IIA | Group II | 44.19 | 27.66 | 0.00 | 30.00 |
| BSABS | IIIA | Group III | 49.54 | 31.46 | 0.00 | 23.38 |
| BSABS | IIA | Group II | 53.46 | 32.64 | 0.00 | 25.94 |
| BSABS | IIA | Group II | 61.17 | 39.46 | 0.00 | 19.43 |
| BSABS | IIIA | Group III | 48.36 | 33.12 | 0.00 | 26.96 |
| BSABS | IIA | Group II | 54.31 | 31.62 | 0.00 | 26.95 |
| BSABS | IIA1 | Group II | 66.83 | 37.42 | 0.00 | 23.78 |
| BSABS | IIIA1 | Group III | 74.70 | 46.92 | 0.00 | 17.14 |
| BSMF 2006- | IIA | Group II | 1.93 | 3.10 | 0.00 | 51.87 |
| BSMF 2006- | IIA | Group II | 3.62 | 3.52 | 0.00 | 57.15 |
| BSMF 2007- | II2A1 | Group II-2 | 100.00 | 44.98 | 0.00 | 13.10 |
| BSMF 2007- | IIA | Group II | 0.47 | 1.12 | 0.00 | 60.70 |
| BSMF 2007- | IIA | Group II | 1.77 | 1.72 | 0.00 | 57.28 |

80

121.   As Table 8 above demonstrates, the Prospectus Supplements for all but one of the Securitizations reported that none of the mortgage loans in the Supporting Loan Groups had an LTV ratio over 100 percent.  In contrast, the data analysis revealed that at least 3.72 percent of the mortgage loans for each Securitization had an LTV ratio over 100 percent, and for most Securitizations this figure was much larger.

122.   These inaccuracies with respect to reported LTV ratios also indicate that the representations in the Registration Statements relating to appraisal practices were false, and that the appraisers themselves, in many instances, furnished appraisals that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.  Indeed, independent appraisers following proper practices and, providing genuine estimates as to valuation, would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.  This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission (the "FCIC"), which identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others,

81

to produce inflated results. *See* FCIC, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (January 2011).

123.    In the Allstate case, the findings of the FHFA forensic experts in the Fannie-Freddie case were independently confirmed by Allstate's forensic experts. In the Allstate case, plaintiff's experts had each underlying property valued by an industry-standard automated valuation model ("AVM"). The AVM that Allstate used incorporated a database of 500 million mortgage transactions covering zip codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States.  Applying the AVM to the available data for the loans underlying the Certificates purchased by Allstate shows that the property values used by Bear Stearns to calculate the represented LTV ratios were materially and consistently inflated. This caused the disclosed LTV and CLTV ratios to be lower than they really were, *i.e.*, the owners were represented to have more of an equity "cushion" than they really did. In applying the AVM to the available data for the loans underlying the Bear Stearns loans also showed that a much higher percentage of loans than represented in the Bear Stearns Offering Materials had LTV ratios higher than 80%: Allstate's analysis also found that, despite Bear Stearns

82

representations, a substantial number of the mortgage loans had LTV ratios greater than 100%: The Bear Stearns Offering Materials likewise misrepresented the number of loans that had CLTV ratios higher than 100%. The AVM indicates that the percentage of loans with CLTV ratios greater than 100% was much higher than represented in the Bear Stearns Offering Materials. Allstate's loan-level analysis also found that the weighted average CLTV was significantly understated. And finally, it was clear from this data that Bear Stearns did not genuinely believe the appraised values were reasonable estimations of the properties' values at the time they were originated.

### c.  Borrower Income, Employment and Assets

124.  On February 17, 2011, Ambac Assurance Corporation ("Ambac") filed an action for fraud and other securities violations against EMC Mortgage Corporation and JP Morgan Securities, Inc., (formerly known as Bear, Stearns & Co. Inc.), index # 650421/2011 (the "Ambac case"). Ambac Assurance Corporation ("Ambac") an insurer that provided insurance for Bear Stearns RMBS, had access to complete loan files for certain Bear Stearns securitizations. These analyses revealed that Bear Stearns misrepresented key elements of the mortgage loans, including widespread disregard of underwriting guidelines.

125.   Ambac's forensic experts reviewed 1,486 loans from these offerings, and found that **89%** involved breaches of representations and warranties made by EMC in the insurance contracts, including the following troubling breaches : (1) rampant misrepresentation about borrower income, employment, assets, and intentions to occupy the purchased properties, and (2) the loan originators' abject failures to adhere to proper and prudent mortgage-lending practices, including their own underwriting guidelines. Based on its investigation, Ambac concluded that the entire pool of loans that EMC securitized in each Transaction was plagued by rampant fraud and an abdication of sound mortgage-origination and underwriting practice. As such, these fraudulent practices implicated not only EMC, but the entire Bear Stearns securitization machine, which Ambac described as a house of cards, supported not by real value and sound practices but by Bear Stearns's appetite for loans and disregard as to the risks those loans presented

126.   In another case involving a bond insurer, ***Assured Guaranty Corp., v EMC Mortgage, LLC (formerly known as EMC Mortgage Corporation) No. 10 Civ. 5367 (NRB) ("Assured")*** made similar discoveries about the fraudulent practices of Bear Stearns through its analysis of loan files associated with EMC's SACO 2005-GP1 offering. Assured wrote

84

insurance for the offering and had access to some of the complete files for loans that were included in the trust pool. Assured's forensic experts conducted two separate analyses of samples of defaulted loans from the offering, which were made public in July 2010. Assured's first review of a sample of 430 defaulted loans revealed "widespread breaches of EMC's representations and warranties in over 88% of the loans examined." Assured's second review of an additional sample of 476 defaulted loans uncovered "widespread breaches of EMC's representations and warranties in over 92% of the loans examined." These widespread defaults involved the same types of loans during the same time period as those underlying Assured's  Bear Stearns Certificates.

### F. BEAR STEARNS KNOWLEDGE OF THE MATERIAL FACTS

#### 1. BEAR STEARNS HAD EXCLUSIVE NONPUBLIC KNOWLEDGE THAT ITS RISK ASSESSMENT MORTGAGE MODELING PROGRAM WAS DEFICIENT AND OUTMODED AND BEAR STEARNS PREVENTED OTHERS INCLUDING PLAINTIFF FROM DISCOVERING THESE FACTS

127.   Since its founding in 1923, Bear Stearns was widely regarded as one of the preeminent investment banks of the world and a shrewd manager of risk. Beginning early in this decade, however, Bear Stearns embarked on a business plan that left it extraordinarily vulnerable to volatility in the

housing market. It purchased and originated enormous numbers of unusually risky subprime and Alt-A mortgages to securitize and sell, and maintained billions of dollars of these assets on its own books. The Company used the assets on its books as collateral to purchase even larger quantities of debt, and to finance the ballooning costs of its daily operations.

128.   One of the Bear Stearns Entities, BSC, was a registered broker-dealer, and as such was subject to a regulatory scheme called the "Broker-Dealer Risk Assessment Program." The program was created in 1990, when Section 17(h) of the Exchange Act was amended to require broker dealers that are part of a holding company structure (as previously stated, BSC was a wholly-owned subsidiary of BSI) with at least $20 million in capital to file with the SEC certain disaggregated information about their finances.

129.   The Broker Dealer Risk Assessment Program called for staff in the SEC's division of Trading and Markets ("TM") to monitor events that might threaten broker-dealers, customers, and the financial markets. Although TM officially tracked the filing status of 146 broker-dealers in the program, it only reviewed in detail the filings of the seven most prominent firms, including Bear Stearns. These seven firms  elected to

86

participate in the **SEC's Consolidated Supervised Entity ("CSE")** program. The CSE program allowed the SEC to supervise participating broker-dealer holding companies on a consolidated basis.

130.   In 2005 and again in 2006, pursuant to the CSE program,  the SEC privately warned Bear Stearns of crucial deficiencies in the models it used to value mortgage-backed securities and to assess risk, both critical tools for assessing the risks of the mortgages it was originating and acquiring for securitization.  The SEC regulators told the Company that the mortgage valuation models it used failed to incorporate data about risk of default, and did not account for key factors such as changes in housing prices.

131.   In its 2008 Report, the OIG stated that, prior to the Company's approval as a CSE in November of 2005, "Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked."

132.   As a result, during the 2005 CSE application process, TM told Bear Stearns that "[w]e believe that it would be highly desirable for independent Model Review to carry out detailed reviews of models in the mortgage area."

87

133.   According to the 2008 OIG Report, these concerns were again communicated to the Company in a December 2, 2005 memorandum from the SEC Office of Compliance Inspections and Examinations ("OCIE") to a Senior Managing Director and BSC's Controller and Principal Accounting Officer.

134.   TM documents cited in the 2008 OIG Report reflect that nearly a year after its admission to the CSE program, on September 20, 2006, Bear Stearns' risk management personnel gave a presentation to the TM division regarding the models that Bear Stearns used to price and hedge various financial instruments.

135.   The 2008 OIG Report stated that as a result of the presentation, TM concluded, among other things, that Bear Stearns' "model review process lacked coverage of mortgage-backed and other asset-backed securities" and that "the sensitivities to various risks implied by the models did not reflect risk sensitivities consistent with price fluctuations in the market." The 2008 OIG Report also revealed that TM's discussions with risk managers in 2005 and 2006 indicated that Bear Stearns' pricing models for mortgages "focused heavily on prepayment risks" but that TM documents did not reflect "how the Company dealt with default risks."

88

136.   However, the mortgage valuation model Bear Stearns used failed to incorporate data about risk of default, and did not account for key factors such as changes in housing prices. As a result, the Bear Stearns model was by design, deficient and outmoded. Bear Stearns chose to use this outmoded and deficient model  in order to conceal from investors, bond insurers, credit rating agencies, shareholders, independent appraisers and borrowers including Plaintiff, "material facts" that negatively impacted the value of the collateral supporting  the loans Bear Stearns originated and acquired for securitization; namely, (i) the extremely high risk character of their nontraditional mortgages as generally described in paragraph 98 above and more fully described in the section of this Third Amended Complaint entitled, ***The Concealed Material Facts***; (ii) the fact that the high risk factors associated with their nontraditional mortgages were not taken into account in the preparation and review of appraisals by the Bear Stearns originators, and (iii) the negative impact these high risk factors would have had on the appraised value of the residential properties supporting their subprime and Alt-A mortgages had they been considered or taken into account by their originators in the appraisal process.

137.   Had Bear Stearns been truly interested in determining the risks associated with originating and acquiring nontraditional mortgages for securitization, it would have revised its mortgage valuation model by incorporating data about risk of default and changing housing prices. The revised model would have benefited Bear Stearns, its investors, credit rating agencies, bond insurers, independent appraisers, and borrowers including Plaintiff, by requiring the third party originators, , under threat of termination of business dealings, to take the revised model data into account in (i) the preparation and review of their appraisals or (ii) to rewrite their underwriting standards to reflect the revised data,  or (iii) a combination of (i) and (ii) above.

138.   Instead of revising its models to incorporate data about risk of default in the context of changing housing prices, and directing its originators to factor the revised data into their underwriting and appraisal standards and guidelines, Bear Stearns persisted in using its misleading, deficient and outmoded mortgage valuation risk models in an effort to maintain high levels of loan volume from its originators. At the same time, Bear Stearns falsely represented to the investing public that it regularly reviewed and updated its valuation and risk models to ensure their accuracy. Analysts, impressed by the strength of Bear Stearns revenues and the apparent

90

conservatism reflected in its risk management practices, recommended Bear Stearns to investors as a sound investment.

**2. <u>BEAR STEARNS HAD EXCLUSIVE NONPUBLIC KNOWLEDGE THAT ITS ORIGINATORS SYSTEMATICALLY DISREGARDED UNDERWRITING STANDARDS AND BEAR STEARNS PREVENTED OTHERS INCLUDING PLAINTIFF FROM DISCOVERING THESE FACTS</u>**

**A. The Clayton Report**

139.   Financial institutions, when assembling mortgage pools for the purpose of inclusion in residential mortgage-backed securities (RMBS), often hire independent analytical companies, like Clayton Holdings LLC ("Clayton"), to perform due diligence on the loans and flag any that are problematic.

140.   Leading up to the financial downturn, Clayton reviewed mortgages for its clients - investment and commercial banks and lending platforms, including those of Bear Stearns. Clayton's review of the Bear Stearns mortgages was for the purpose of determining whether these loans met specifications like loan-to-value ratios, credit scores and the income levels of borrowers; that is, whether the loan-level characteristics conformed to underwriting standards and guidelines.

141.   The Financial Crisis Inquiry Commission was created by the Fraud Enforcement and Recovery Act of 2009, and was established to

examine the causes, domestic and global, of the current financial and economic crisis in the United States. In February of 2011, the Financial Crisis Inquiry Commission (the "FCIC") found that in the period from the first quarter of 2006 to the second quarter of 2007, 16 percent of the mortgage loans Bear Stearns submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 42 percent of the loans were subsequently waived in by Bear Stearns without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here. *See The Financial Crisis Inquiry Report*, at 167, Jan. 2011, *available at* http://fcic- atic.law.stanford.edu /cdn  media/fcic-reports/fcic_final_report_full.pdf.

142.   Confronted with such a high failure rate, Bear Stearns should have either rejected the pool outright, increased oversight of their own internal underwriting, or investigated whether the third-party originators involved could be considered a trusted source of loans in the future. Even assuming Bear Stearns incredibly believed a 16 percent, failure rate could be chalked up to "sampling error" (due to the fact that Clayton Holdings did not review every loan in a pool), the proper

response would have been to increase the sample size to test that hypothesis.

143.   Instead, Bear Stearns continued to use its deficient and outmoded mortgage valuation program and to purchase loans from its originators that it knew were defective. Moreover, not only did they fail to expand the sample size to truly investigate the problems, they failed to disclose the red flags revealed by Clayton's review to third parties such as investors, credit rating agencies, bond insurers, independent appraisers, or borrowers including Plaintiff. According to Clayton's "Trending Report," Bear Stearns "waived in" to their pools 42 percent of the defective loans that Clayton had identified as being outside the guidelines.

144.   Clayton's "Trending Report" provides compelling evidence that Bear Stearns knew it was originating and acquiring defective loans for securitization from its originators and selling the resulting securities to investors. According to the September 23, 2010 testimony of Clayton's Vice President Vicki Beal, through their numerous roles as underwriter and sponsor, Bear Stearns was made fully aware on a regular basis that a significant percentage of its loans failed to meet stated underwriting guidelines, but were being included anyway in the pools underlying

securities sold to investors, such as those collateralizing the GSE Certificates.

145.   Not only did Bear Stearns let poor loans pass into their securitizations in exchange for underwriting and securitization fees, they also took the fraud further, affirmatively seeking to profit from this knowledge.  Rather than rejecting these loans from the loan pool, as it should have, Bear Stearns used the evidence of underwriting defects to negotiate lower prices for the loans and thus boost its own profits.  According to the September 2010 FCIC testimony of Clayton's former president, D. Keith Johnson, Bear Stearns would use the exception reports to force a lower price for itself, and not to benefit investors at all: "I don't think that we added any value to the investor, the end investor, to get down to your point.  I think only our value was done in negotiating the purchase between the seller and securitizer.  Perhaps the securitizer was able to negotiate a lower price, and could maximize the line.  We added no value to the investor, to the rating agencies." FCIC Staff Int'v with D. Keith Johnson, Clayton Holdings, LLC (Sept. 2, 2010), *available at* http://fcic.law.stanford.edu/resource/interviews.  In other words, rather than exclude defective loans from collateral pools, or cease doing business with consistently failing originators, Bear

94

Stearns would instead use the Clayton data simply to insist on a lower price from the loan originators, thereby increasing their own profits while the defective loans were included in the pools for securitization.

146.   Further, Bear Stearns failed to disclose the defect rates and other misinformation to the credit ratings agencies that required the information in determining the credit rating of a Securitization.  Bear Stearns the ratings agencies the same false loan level data regarding loan-to-value ratios, owner-occupancy status, home values, and debt-to-income ratios that they provided to investors and bond insurers in aggregate form in the Prospectuses and Prospectus Supplements.  The rating agencies then input this false data into their quantitative models to assess the credit risk associated with the RMBS, project likely future defaults, and ultimately, determine the ratings on the RMBS products of Bear Stearns. As a result, Bear Stearns essentially pre-determined the ratings by feeding bad data into the ratings system.

### B. Early Payment Defaults

147.   In early 2005, Bear Stearns quietly revised its protocols to allow it to securitize loans before the expiration of the thirty- to ninety-day period following the acquisition of the loans by EMC, referred to as the "early payment default" or "EPD" period. Bear Stearns previously held loans in

inventory during the EPD period because loans that miss a payment shortly after the loan origination (*i.e.*, within the EPD period) raise "red flags" that the loans never should have been issued in the first instance The revised policy enhanced Bear Stearns' earnings by increasing the volume of loans it sold into the securitizations – but materially increased the riskiness of loans sold to the securitizations. Nonetheless, as its executives uniformly conceded, Bear Stearns never once disclosed the changes in its due diligence and securitization policies to investors or financial guarantors.

148.   And it gets a lot worse. Not satisfied with the increased fees from the securitizations, Bear Stearns executed a scheme to double its recovery on the early payment defective loans. Thus, when the early payment defective loans it purchased and then sold into securitizations stopped performing during the EPD period, Bear Stearns confidentially (i) made claims against the originators from which it purchased the loans for the amount due on the loans, (ii) settled the claims at deep discounts, (iii) pocketed the recoveries, and (iv) left the early payment defective loans in the securitizations.  Bear Stearns did not tell the originators of the loans that it did not own, but rather had securitized, the loans as to which it made the claims, and did not tell the securitization participants that it

made and settled claims against the originators. Nor did it review the loans for breaches of EMC's representations and warranties in response to the "red flags" raised by the EPDs. Bear Stearns thus profited doubly on the early payment defective loans it sold into securitizations. Indeed, the increase in loan volume from the securitization of defective loans proved so substantial, and the recoveries secured on those defective loans proved so lucrative that, by the end of 2005, the Bear Stearns' trading desk mandated that all loans were to be securitized before the EPD period expired (Email from Chris Scott, Bear, Stearns & Co. Senior Managing Director, Trading, to, among others, Robert Durden, BSC's Deal Manager, and Keith Lind, BSC's Managing Director, Trading, dated January 3, 2006).

149.   Bear Stearns also concealed that its "quality control" and "repurchase" processes were *not* devoted to flushing out and removing breaching loans from the securitized pools, as Bear Stearns had represented. Rather, the processes were dedicated to securing recoveries against the originators of its toxic loans. That is, the quality control and repurchase departments' resources were focused virtually exclusively on (i) identifying grounds for Bear Stearns to make claims against the originators of the loans it securitized, and (ii) settling the claims at a

discount – without ever notifying the securitization participants of the defective loans it identified or the funds it received. In other words, the quality control department that Bear Stearns touted to bond insurers and investors did not provide them with the represented benefits.

150.   The secret settlement of the claims on the securitized loans was a win-win for Bear Stearns and its originators, but a loss for the securitizations. It was a win for the originators in that they settled in confidence all claims with respect to the defective loans at a fraction of the full amount that would have been due had the loans been repurchased from the securitization. Conversely, if they did not comply with Bear Stearns' repurchase demands, Bear Stearns cut off the financing it extended for the origination of additional defective loans. (*See* Letter from Stephen Golden, EMC Residential Mortgage Corp. President, to SouthStar Funding LLC, dated April 9, 2007, EMC-AMCB1 57571-72; Email from Paul Friedman, Bear, Stearns & Co. Senior Managing Director, Fixed Income, to Jeffrey Mayer, Bear, Stearns & Co. Senior Managing Director and Co-Head of Fixed Income, dated April 18, 2007). ***By agreeing to finance and purchase loans from originators of defective loans, Bear Stearns effectively engaged in the origination of defective loans.*** The secret settlement was a win for Bear Stearns, which

(i) reinforced its relations with the originators that it depended on to provide the precious fodder for future securitizations by settling at the discounted amount, and (ii) pocketed the recovery from the suppliers. It was a loss to the securitization participants, which were not notified of the early payment defective loans in the securitizations and did not receive the benefit from the repurchase of early payment defective loans from the securitizations. Indeed, having settled with originators at a fraction of the outstanding principal and interest due on the loans, Bear Stearns had an economic *disincentive* to honor its securitization obligations to identify and repurchase breaching loans from the trusts at the full outstanding amounts due.

C.  **Bear Stearns' Internal Audit Report**

151.  Ironically, Bear Stearns' scheme worked so well – and resulted in the securitization of so many loans made to borrowers that could not repay – that its quality control and repurchase processes were soon overwhelmed (4/26/2010 Golden Deposition Tr. at 119). By late 2005, Bear Stearns' Internal Audit department caught wind of the "significant backlog for collecting from and submitting claims to sellers," which it then tracked from October 2005 through January 2007 (Bear Stearns Internal Audit Report, dated February 28, 2006). Yet Bear Stearns did not disclose that

99

its lauded repurchase protocols were overwhelmed and were not providing any benefit to the securitizations, and that it was not evaluating whether the defective loans it identified complied with EMC's representations and warranties to the securitization participants.

152.    Bear Stearns Internal Audit Reports also described the various reductions in due diligence.  According to February 28, 2006, and June 22, 2006 reports, Bear Stearns would reduce the number of loans in the loan samples that were reviewed as part of the due diligence process, conduct due diligence only after the loans were purchased ("post-closing" due diligence), eliminate internal reports on defective loans, and conduct no due diligence if such due diligence would interfere with mortgage loan pools being securitized.  *The Atlantic* confirmed this abandonment of reasonable due diligence procedures in a May 2010 article describing: (i) how Bear Stearns pressured EMC analysts to perform their due diligence of the underlying mortgages in only one to three days; (ii) how Bear Stearns encouraged EMC analysts to falsify loan data including FICO scores) if the loan file was missing the requisite information; and (iii) how Bear Stearns pushed EMC analysts to avoid investigating a potentially bad loan and instead focus on making it "fit." "E-mails Suggest Bear Stearns Cheated Clients Out of Billions,"

*The Atlantic* (Jan. 25, 2011).

153.    Former EMC mortgage analyst Matthew Van Leeuwen, an employee from 2004 to 2006, confirmed in a March 30, 2009 e-mail that "the pressure was pretty great for everybody to just churn the mortgages on through the system," so that if there were "outstanding data issues" analysts should just "fill in the holes."  The pressure was directed from the top of Bear Stearns' corporate structure.  For example, EMC's Senior Vice President of Conduit Operations, Jo-Karen Whitlock, told her staff to do "whatever is necessary" to meet Bear Stearns' objectives for desired loan production.  Her April 14, 2006 e-mail further stated:  "I refuse to receive any more emails . . . questioning why we're not funding more loans each day.  I'm holding each of you responsible for making sure we fund at least 500 each and every day. . . . [I]f we have 500+ loans in this office we MUST find a way to . . . buy them. . . . I expect to see 500+ each day. . . . I'll do whatever is necessary to make sure you're successful in meeting this objective."

**154.**    Not surprisingly, given the abandonment of due diligence and underwriting standards by Bear Stearns, loans acquired by Bear Stearns began to default at an increasing rate. These triggered concern in Bear Stearns as early as 2005.  Rather than improving the quality of loans

101

acquired for securitization, Bear Stearns reacted by changing the time period in which Bear Stearns was required to hold loans it acquired. Previously, Bear Stearns was required to hold third-party loans in inventory for between 30 and 90 days before the loans could be securitized. This allowed Bear Stearns to determine whether any of the loans would suffer from an early payment default.

155.   In 2006, Bear Stearns stopped screening out these defective loans and instead required that all mortgage loans be securitized before the early payment default period expired. Bear Stearns Senior Managing Director Jeffrey Verschleiser confirmed the revised protocol in a June 13, 2006 e-mail to Haggerty stating that they need  "to be certain we can securitize the loans with 1 month EPD before the EPD period expires." This desire to unload bad mortgage loans by selling them to other investors through the securitization process was further evidenced by a May 5, 2007 e-mail from Bear Stearns Managing Director Keith Lind, who demanded "to know why we are taking losses on 2nd lien loans from 2005 when they could have been securitized?????"

3.   **BEAR STEARNS HAD EXCLUSIVE NONPUBLIC KNOWLEDGE THAT ITS THIRD PARTY ORIGINATORS SOLD DEFECTIVE LOANS TO OTHER SECURITIZERS AND BEAR STEARNS PREVENTED OTHERS INCLUDING PLAINTIFF FROM DISCOVERING THESE FACTS**

## A. The Additional 16 FHFA Case Filings

156.    All of the defective mortgages **acquired** by Bear Stearns for securitization were originated and sold to Bear Stearns by the following originators: Long Beach Mortgage, Countrywide, New Century Mortgage, WMC, Argent, Ameriquest, Fremont, ResMAE, American Home, IndyMac, GreenPoint, People's Choice, Fieldstone, PHH, Option One, and SouthStar (the "Bear Stearns third-party originators").

157.    As shown above, Bear Stearns knew it was purchasing defective loans from the Bear Stearns originators, and it knew that the loans it was purchasing were only a small percentage of the nontraditional mortgages originated by these originators during the period of 2005-2007. And finally, Bear Stearns knew that the loans it did not purchase; i.e., the un-purchased loans were being sold to other securitizers. Bear Stearns concealed this information from the public and actively prevented others from discovering it.

158.    On July 31, 2011, the same date the FHFA filed the Fannie-Freddie action (*supra*), the FHFA, as conservator for Fannie Mae and Freddie Mac, filed 16 additional lawsuits against 16 different major financial institutions.  Complaints were filed against the following lead defendants (including JPMORGAN Chase in the Fannie-Freddie case), in

alphabetical order:  Ally Financial Inc. f/k/a GMAC, LLC; Bank of America Corporation;  Barclays Bank PLC ; Citigroup, Inc.; Countrywide Financial Corporation; Credit Suisse Holdings (USA), Inc.; Deutsche Bank AG; First Horizon National Corporation; General Electric Company ; Goldman Sachs & Co.; HSBC North America Holdings, Inc.;  JPMorgan Chase;  Merrill Lynch & Co.; First Franklin Financial Corp.; Morgan Stanley; Nomura Holding America Inc.; The Royal Bank of Scotland Group PLC;  Société Générale

159.   All of the above complaints were filed in federal or state court in New York or the federal court in Connecticut. Each complaint seeks damages and civil penalties under the Securities Act of 1933. In addition, each complaint seeks compensatory damages for negligent misrepresentation. Certain complaints also allege state securities law violations or common law fraud. The 17 lawsuits cover $105 billion worth of securities purchased by Fannie Mae and Freddie Mac and collateralized by mortgages originated between 2005-2007 in which the securitizers purchased a substantial and significant portion of these mortgages from the very same third-party originators who sold their loans to Bear Stearns. Plaintiff herein hereby incorporates by reference all of the complaints filed by the FHFA on July 31, 2011. To view in tabular form

all of the complaints filed by the FHFA in all 17 lawsuits go to the following website:  http://www.fhfa.gov/Default.aspx?Page=110.

160.    There were some amazing similarities between the Fannie-Freddie case and the 16 additional FHFA cases:

**A.** The mortgages securitized were nontraditional mortgages originated during the same time period as the mortgages originated in the Fannie-Freddie case; namely 2005-2007.

**B.** The credit rating agencies in all 16 additional FHFA filings, subsequently downgraded all of the securitizations from investment grade to junk bond status.

**C.** The FHFA made the same allegations it made against all of the defendants in the Fannie-Freddie case; namely, that mortgage loans in the supporting loan groups, contrary to the representations in the Registration Statements, were not originated in accordance with the stated underwriting guidelines, resulting in massive <u>actual percentage losses</u> from delinquencies, defaults and foreclosures that were substantially greater than the <u>expected percentage losses</u> from investment grade securities.

D. And the FHFA conducted statistical studies and analyses identical to the ones conducted in the Fannie-Freddie case that showed that

a substantial percentage of the mortgages securitizing the securities purchased by Fannie Mae and Freddie Mac were originated in violation of originator standards and guidelines.

161.   In short, for nontraditional mortgages originated between 2005-2007, the 17 FHFA filings clearly show that the expected probability of loss for subprime mortgages originated in compliance with the originator's stated underwriting standards and guidelines, coupled with the increased risk of loss for those subprime and Alt-A mortgages originated in violation of the originators lending standards and guideline, was so great that it was a virtual certainty that by the end of 2008, a  substantial percentage (greater than the 19% amount projected by the ***Center for Responsible Lending)***, would default and be foreclosed upon and sold **<u>in such large numbers</u>** that the aggregate effect of these sales would cause the supply-demand sensitive housing market to be overwhelmed with more homes than could be sold at existing price levels, resulting in a significant and steady decline in home prices substantially below the amounts owed on the mortgages originated from 2005-2007 including Plaintiff's mortgages.

   **B. Worse of the Worst**

162.   The list below sets forth the ten metropolitan areas that had the highest rates of foreclosure in the first half of 2008 as reported by

106

*RealtyTrac*.  In this ex post facto study, foreclosure rates for sub-prime and Alt-A mortgages originated from 2005 through 2007 were computed using data from Loan Performance. The metropolitan areas in order of most foreclosures are as follows: 1 Detroit 22.9% 2 Cleveland 21.6% 3 Stockton 21.5% 4 Sacramento 18.0% 5 Riverside/San Bernardino 16.1% 6 Memphis 15.6% 7 Miami/Fort Lauderdale 14.3% 8 Bakersfield 14.3% 9 Denver 14.0% 10 Las Vegas 13.9%.

163.     For each of these metro areas, the "Worst Ten" originators were identified: the ten originators in each area with the largest number of non-prime mortgage foreclosures in the Loan Performance database for 2005-2007 originations.

164.     Only 21 companies in various combinations occupy the Worst Ten slots in the Worst Ten metro areas. These companies are listed in the table below.   The originators listed below accounted for nearly 60 percent of non-prime mortgage loans and foreclosures in the Worst Ten metro areas in 2005-2007.

**165.     <u>Fourteen of the sixteen Bear Stearns originators appear on the list below.</u>**

| Index to the Worst Subprime Originators Originator | Supervisor | Foreclosures in Worst 10 Metro Areas, based on 2005-07 Originations |
|---|---|---|
| New Century Mortgage Corp. | State supervised. Subsidiary of publicly-traded REIT, filed for bankruptcy in early 2007. | 14,120 |
| Long Beach Mortgage Co. | State and OTS supervised. Affiliate of WAMU, became a subsidiary of thrift in early 2006; closed in late 2007 / early 2008. | 11,736 |
| Argent Mortgage Co. | State supervised until Citigroup acquired certain assets of Argent in 08/07. Merged into CitiMortgage (NB opsub) shortly thereafter. | 10,728 |
| WMC Mortgage Corp. | State supervised. Subidiary of General Electric, closed in late 2007. | 10,283 |
| Fremont Investment & Loan | FDIC supervised. California state chartered industrial bank. Liquidated, terminated deposit insurance, and surrendered charter in 2008. | 8,635 |
| Option One Mortgage Corp. | State supervised. Subsidiary of H&R Block, closed in late 2007. | 8,344 |
| First Franklin Corp. | OCC supervised. Subsidiary of National City Bank until 12/06. Sold to Merrill Lynch, closed in 2008. | 8,037 |
| Countrywide | Data includes loans originated by (1) Countrywide Home Loans, an FRB supervised entity until 03/07, and an OTS supervised entity after 03/07; and (2) Countrywide Bank, an OCC supervised entity until 03/07, and an OTS supervised entity after 03/07. | 4,736 |
| Ameriquest Mortgage Co. | State supervised. Citigroup acquired certain assets of Ameriquest in 08/07. Merged into CitiMortgage (NB opsub) shortly thereafter. | 4,126 |
| ResMae Mortgage Corp. | State supervised. Filed for bankruptcy in late 2007. | 3,558 |
| American Home Mortgage Corp. | State supervised. Filed for bankruptcy in 2007. | 2,954 |
| IndyMac Bank, FSB | OTS supervised thrift. Closed in July 2008. | 2,882 |
| Greenpoint Mortgage Funding | FDIC supervised. Acquired by Capital One, NA, in mid 2007 as part of conversion and merger with North Fork, a state bank. Closed immediately thereafter in 08/07. | 2,815 |
| Wells Fargo | Data includes loans originated by (1) Wells Fargo Financial, Inc., an FRB supervised entity, and (2) Wells Fargo Bank, an OCC supervised entity. | 2,697 |
| Ownit Mortgage Solutions, Inc. | State supervised. Closed in late 2006. | 2,533 |
| Aegis Funding Corp. | State supervised. Filed for bankruptcy in late 2007. | 2,058 |
| People's Choice Financial Corp. | State supervised. Filed for bankruptcy in early 2008. | 1,783 |
| BNC Mortgage | State and OTS supervised. Subsidiary of Lehman Brothers (S&L holding company), closed in August 2007. | 1,769 |
| Fieldstone Mortgage Co. | State supervised. Filed for bankruptcy in late 2007. | 1,561 |
| Decision One Mortgage | State and FRB supervised. Subsidiary of HSBC Finance Corp. Closed in late 2007. | 1,267 |
| Delta Funding Corp. | State supervised. Filed for bankruptcy in late 2007. | 598 |

108

## G. **BEAR STEARNS LIABILITY TO PLAINTIFF**

166.   From 2001-2007, the Bear Stearns Entities, acting in concert with each other and under the direction of the parent company, BSI, specialized in originating, acquiring, pooling, securitizing, selling and servicing nontraditional mortgages.

167.   Bear Stearns followed a vertically integrated model that made money at every step, from loan origination through securitization, sale and servicing. It both acquired and created its own captive originators to generate mortgages that Bear bundled, turned into securities, and sold to investors.

168.   BSI, acting directly and through its wholly owned subsidiaries (EMC, BSC, SAMI, BSABS, EMCRC and BSRM) (the "Bear Stearns Entities") controlled every link in the mortgage-loan-securitization chain, including (i) the origination, and financing of the loans that provided the cash flow for the mortgage-backed securities, (ii) the "warehousing" or temporary financing of large pools of loans pending their pooling and securitization into mortgage-backed securities, (iii) the underwriting, offering, and sale of the mortgage-backed securities, included to funds managed by its affiliates, and (iv) the servicing of loan pools to ensure the continued payment of principal and interest needed to make payments under the

109

mortgage-backed securities (referred to hereafter as the "securitization process").

169.   Bear Stearns acting through EMC obtained a portion of the loans for securitization from its originator affiliates BSRM and EMCRC. However, the bulk of its mortgages were purchased from large third-party originators (Bear Stearns third party originators)..

170.   Bear Stearns offered an advance line of funds available to its originators to maintain the constant stream of loans acquired by EMC for securitization and reminding the Originators that it would pay premium pricing on any loans originated and sold to EMC. Because the originators were not lending their own funds, the Bear Stearns Entities encouraged and enabled them to originate a continuous flow of loans, thereby providing the originators with the means by which to approve and generate thousands of mortgages.

171.   Bear Stearns leveraged its Originators to dictate loan-origination standards for the loans it securitized, either by requiring that loans be originated to its published guidelines or by approving the guidelines used by its larger originators, with whatever changes the Bear Stearns Entities believed were necessary. But, Bear Stearns abandoned the protocols necessary to ensure adherence to those guidelines.

172.   BSC, for its part, acted as lead underwriter and designated its employees as the deal managers to broker the EMC-sponsored securities offerings. It solicited the rating agencies to rate, financial guarantors to insure, and investors to purchase these mortgage-backed securities. Thus BSC worked with EMC to structure the Transactions, (ii) took the lead in coordinating the flow of documents and information among the rating agencies and parties to the Transactions, (iii) purchased the mortgage-backed securities issued in the Transactions (the "Notes") on a firm commitment basis pursuant to written agreements with the Depositor, and (iv) offered and sold the Notes to investors. BSC also made the decisions on the volume of securitizations to effectuate, and, likewise, the volume of loans being acquired by the conduit was "highly controlled by the trading desk."

173.   Bear Stearns also frequently purchased or retained a financial interest in a portion of the securities issued in these transactions, which it often repackaged into securities known as "collateralized debt obligations" ("CDOs").

174.   Bear Stearns recorded gains and earned fees at every step in this chain: (i) loan-origination fees, (ii) gains on sale of the mortgages to the securitization trusts, (iii) fees from underwriting mortgage-backed

111

securities, (iv) fees from servicing of the securitized loans, (v) fees from CDOs into which these securities were repackaged, (vi) gains and fees from trading in these securities and interests in the CDOs into which they were placed, and (vii) management fees and carried interests from hedge funds and other investment vehicles that invested in the vast array of securities and financial products structured by the Bear Stearns Entities and its affiliates that ultimately were backed by residential mortgage loans.

175.   But ultimately, the real benefactors from these fees were (i) the senior executives and traders, who obtained obscene compensation from the Bear Stearns profits, and (ii) BSI itself, whose ownership interest in all of the other Bear Stearns Entities allowed it to enjoy the fruits of their labors.

176.   Each Bear Stearns Entity played an important role in the business scheme. However, there was one role that was common to each of them and it was this common role that converted their securitization business into a fraudulent scheme prior to the origination of Plaintiff's two mortgages; namely, (i) each Entity concealed "material facts" from persons the Entity was under a legal duty to disclose such material facts to; namely, investors, bond insurers, credit rating agencies, SEC

112

regulators, shareholders and borrowers including Plaintiff; (ii) each Entity knew that the other Entities were concealing "material facts" from persons they were under a duty to disclose such material facts to; (iii) each Entity knew that the concealment of "material facts" by the other Entities constituted a breach of duty by the other Entity, and knowing this, each Entity gave substantial assistance and encouragement to the other Entities to breach their respective duties, and (iv) as a consequence of giving substantial assistance to the other Entities in breaching their respective duties, the conduct of each Entity, separately considered, constituted a breach of duty to all of the persons who had a legal right to have such material facts disclosed to them by the other Entities; namely, credit rating agencies, bond insurers, investors, shareholders, security regulators and borrowers including Plaintiff.

177.   At the time Plaintiff financed her home, the joint venture business scheme had become fraudulent because the Bear Stearns Entities conspired and agreed with each other to conceal from investors, bond insurers, credit rating agencies, securities regulators, shareholders and borrowers including Plaintiff, "material facts" as that term is described and defined in paragraphs 97 thru 165 in the section of this Third Amended Complaint entitled: ***The Concealed Material Facts***.

113

178.    From Plaintiff's perspective, the fraudulent business scheme took the following form: BSRM's role in the fraudulent business scheme, with substantial assistance and support from the other Bear Stearns Entities, was to originate as many nontraditional mortgages as possible for securitization by the other Bear Stearns Entities even if that objective required that it violate its own underwriting and appraisal standards and guidelines. Toward that end, BSRM, with the substantial assistance and approval of the other Bear Stearns Entities, concealed the above referenced "material facts" in the preparation and review of its appraisals. Had BSRM and the other Bear Stearns Entities acted as mere conventional lenders in accordance with industry standards, BSRM would have taken the "material facts" into account in the preparation and review of its appraisals including Plaintiff's appraisal, because the *assessment of mortgage default and foreclosure risk is a critical component of  the residential underwriting and appraisal process.* But Bear Stearns chose to abandon the conventional role of a money lender conducting appraisals for the purpose of determining if the borrowers collateral were adequate and sufficient to support their loans. Had Bear Stearns not abandoned the role of a conventional money lender and taken the "material facts" into account in the preparation and review of their

114

appraisals, Bear Stearns would have been compelled to either discount the value assigned to the collateral by their independent appraisers in accordance with the default and foreclosure risks reflected in the "material facts," or created a substantially safer spread in their loan-to-value ratios (i.e., demanding more equity from borrowers) in accordance with the default and foreclosure risks reflected in the "material facts," or simply disclosed the "material facts" to their borrowers prior to making a loan; that is, warn their borrowers about the default and foreclosure risks reflected in the "material facts." But Bear Stearns chose not to do any of the above, because doing so would have the inevitable effect of substantially reducing loan volume and profits. Thus by failing to take these material facts into account, Bear Stearns was able to maintain and expand its loan volume. But to do so required that Bear Stearns convert the appraisal process from one in which the lender prepares and reviews appraisals to ascertain whether the collateral is adequate and sufficient to support its loans, into one in which the appraisal becomes an instrument to fraudulently induce prospective borrowers, like Plaintiff, to enter into a loan transaction under the false belief that the value of the homes they are financing are equal to the purchase price; that is, worth more than they are actually worth.

115

**THE JPMORGAN DEFENDANTS**

**1.  JPMORGAN as successor-in-interest to all of the Bear Stearns Entities**

179.   On March 16, 2008, BSI entered into the Agreement and Plan of Merger with JPMorgan Chase for the purpose of consummating a "strategic business combination transaction" between the two entities. Pursuant to the Merger, BSI merged with BSLLC  (The Bear Stearns Companies LLC) making BSI and all of its subsidiaries a wholly-owned subsidiary of JPMorgan Chase.  As such, upon the May 30, 2008 effective date of the Merger, JPMorgan Chase became the ultimate corporate parent of BSI's subsidiaries BSC, EMC, SAMI, BSABS and BSRM.

180.   JPMorgan Chase took immediate control of Bear Stearns' business and personnel decisions, according to *The New York Times* in an article published April 6, 2008.  The article cited an internal JPMorgan memo revealing that "JPMorgan Chase, which is taking over the rival investment bank Bear Stearns, will dominate the management ranks of the combined investment banking and trading businesses."  Of the 26 executive positions in the new merged investment banking and trading division, only five would come from Bear Stearns.

116

181.   In a June 30, 2008 press release describing internal restructuring to be undertaken pursuant to the Merger, JPMorgan Chase stated its intent to assume Bear Stearns and its debts, liabilities, and obligations as follows:

> Following completion of this transaction, Bear Stearns plans to transfer its broker- dealer subsidiary Bear, Stearns & Co. Inc. to JPMorgan Chase, resulting in a transfer of substantially all of Bear Stearns' assets to JPMorgan Chase. In connection with such transfer, JPMorgan Chase will assume (1) all of Bear Stearns' then-outstanding registered U.S. debt securities; (2) Bear Stearns' obligations relating to trust preferred securities; (3) Bear Stearns' then-outstanding foreign debt securities; and (4) Bear Stearns' guarantees of then- outstanding foreign debt securities issued by subsidiaries of Bear Stearns, in each case, in accordance with the agreements and indentures governing these securities.

182.   In *Monaco v. Bear Stearns Companies, Inc., CV 09-05438 SJO JCX, 2011 WL 4059801 (C.D. Cal. Sept. 12, 2011),* Plaintiffs presented evidence illustrating that Carl del Vecchio, Assistant Vice President and Legal Specialist Officer for JPMorgan, admitted that JPMorgan is the successor-in-interest to BSRM. Plaintiffs' evidence, which was attached to the SAC as an exhibit, consists of a declaration filed by Mr. Del Vecchio in *Byron v. EMC Mortg. Corp., No. CV 09–197, 2009 WL*

***2486816 (E.D.Va. Aug. 10, 2009).*** (SAC Ex. 3.) (See footnote 12 in

Monaco v. Bear Stearns Companies, Inc., supra).

183.   Consequently, Defendant JPMorgan Chase is liable for the

wrongdoing of the Bear Stearns Entities, in their entirety, under common

law, because BSI merged and consolidated with Defendant JPMorgan

Chase, because Defendant JPMORGAN Chase has expressly or

impliedly assumed the tort liabilities of BSRM and the other Bear Stearns

Entities, and because Defendant JPMorgan is a mere continuation of

BSRM and the other Bear Stearns Entities.  This action is thus brought

against Defendant JPMorgan Chase as successor-in-interest to BSRM

and the other Bear Stearns Entities.

**1.  BSLLC as successor-in-interest to BSI**

184.   Pursuant to the Merger, BSI merged with The Bear Stearns Companies,

LLC (Defendant BSLLC")).. As a result of the Merger, Defendant BSLLC

became successor-in-interest to BSI. As successor-in-interest to BSI,

Defendant BSLLC is liable for the wrongdoing of BSI, in its entirety,

under common law, because BSI  merged and consolidated with

Defendant BSLLC,  because Defendant BSLLC has expressly or

impliedly assumed the tort liabilities of BSI, and because Defendant

BSLLC is a mere continuation of BSI.

**2. Defendant JPMorgan Securities is Successor-in-Interest to BSC**

185.   BSC subsequently merged with JPMorgan Securities and is now doing business as JPMorgan Securities.  JPMorgan's 2008 Annual Report described the transaction as a merger, stating that "[o]n October 1, 2008, JPMorgan Securities Inc. merged with and into Bear, Stearns & Co. Inc., and the surviving entity changed its name to JPMORGAN Securities Inc."

186.   Further, the former Bear Stearns website, www.bearstearns.com, redirects Bear visitors to JPMORGAN Securities' website, and the EMC website, www.emcmortgagecorp.com, now identifies EMC as a brand of JPMorgan Bank.

187.   JPMORGAN Securities was fully aware of the pending claims and potential claims against the Bear Stearns Entities when it consummated the merger with BSC.  JPMORGAN Securities has further evinced its intent to assume BSC liabilities by paying to defend and settle lawsuits brought against BSC.

188.   As a result of its merger with BSC, JPMORGAN Securities is the successor-in- interest to BSC and is jointly and severally liable for the misstatements and omissions of material fact alleged herein of BSC.

**3. Defendant EMC as successor-in-interest to EMC**

119

189.   Prior to the Merger, EMC Mortgage Corporation (previously, "EMC"), a mortgage servicing company, was a Delaware corporation with its principal place of business located at 2780 Lake Vista Drive, Lewisville, Texas 75067 and a wholly-owned subsidiary of BSI. After the  Merger, EMC became a wholly owned subsidiary of Defendant BSLLC with its principal place of business located at 2780 Lake Vista Drive, Lewisville, Texas 75067. On March 31, 2011, EMC converted from a Delaware corporation to a Delaware limited liability company and changed its name from EMC Mortgage Corporation to EMC Mortgage LLC ("Defendant EMC") with its principal place of business remaining located at 2780 Lake Vista Drive, Lewisville, Texas 75067. At the time of filing the Initial complaint, (i) Defendant EMC was a Delaware limited liability company; and (ii) Defendant EMC's sole member was Defendant BSLLC. As previously stated, at the time of filing the Initial Complaint, (i) Defendant BSLLC was a Delaware limited liability company and (ii) Defendant BSLLC's sole member was Defendant JPMORGAN Chase. As previously stated, at the time of  filing the Initial Complaint, Defendant JPMORGAN Chase was a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, N.Y. 10017-2010. Plaintiff is informed and believes that in October

120

of 2011, Defendant EMC changed its name to "Chase Mortgage, LLC."
However, at the time of the filing of the Initial Complaint, Defendant
EMC had not informed the California Secretary of State of its name
change and Defendant EMC continues to do business in the State of
California under the name of EMC Mortgage LLC with its principal place
of business at 2780 Lake Vista Drive, Lewisville, Texas 75067.
Defendant EMC is liable for EMC's wrongdoing, in its entirety, under
common law, because EMC merged and consolidated with Defendant
EMC, because Defendant EMC has expressly or impliedly assumed
EMC's tort liabilities, and because Defendant EMC is a mere
continuation of EMC.  This action is thus brought against Defendant
EMC as successor-in-interest to EMC. As a result of the Merger, all
allegations against EMC are made against its successor-in-interest,
Defendant EMC.

**4.  Defendant Chase's successor liability for EMC/Defendant EMC**

190.  At the time of filing the Initial Complaint, JPMORGAN Chase Bank,
National Association ("Defendant Chase") was a (i) national banking
association, (ii) a wholly owned banking subsidiary of Defendant
JPMORGAN Chase, (iii) a Delaware corporation with its principal place
of business located in Columbus, Ohio, (iv) a member of the Federal

121

Reserve System and (v) its deposits are insured by the Federal Deposits

Insurance Corporation ("FDIC"). On April 1, 2011, Defendant EMC

assigned to Defendant Chase, the mortgage servicing rights it had

acquired from EMC in March of 2008. As a result, servicing of the

mortgage loans previously serviced by EMC and its successor-in-interest,

Defendant EMC, was transferred to Defendant Chase on April 1, 2011.

The transfer to Defendant Chase is permitted by and complies with the

terms of the Servicing Agreements and Defendant Chase agreed to be

bound by the terms and conditions of the related Servicing Agreements.

From March of 2008 until April 1, 2011, records for loans acquired from

EMC were maintained by Defendant EMC under Defendant Chase's

control, management and supervision. Effective April 1, 2011, those

records are now maintained by Defendant Chase as a result of its

acquisition. After the Merger and until April 1, 2011, Defendant EMC's

sole and primary business involved the servicing and maintaining of the

mortgage loans originated and acquired for securitization by its

predecessor-in-interest, EMC. As a result of the acquisition of these

servicing rights from Defendant EMC, Defendant Chase is liable for

EMC and Defendant EMC's wrongdoing, in their entirety, under

common law, because the transfer under California law amounts to a de

122

facto merger of Defendant EMC with Defendant Chase, because inadequate consideration was given to Defendant EMC for the assets it assigned to Defendant Chase to meet the claims of its unsecured creditors, because there is complete identity of ownership between Defendant Chase and Defendant EMC; i.e., Defendant Chase is a wholly owned subsidiary of Defendant JPMORGAN Chase and Defendant EMC's sole member is Defendant Chase, and because Defendant Chase is a mere continuation of EMC and Defendant EMC. This action is thus brought against Defendant Chase based on Defendant Chase's successor liability under California law for the wrongdoing of EMC and Defendant EMC. As a result of its successor liability, all allegations against EMC and Defendant EMC are thus made against Defendant Chase.

191.   Therefore, this action is brought against Defendant JPMorgan Chase as the successor-in-interest to the Bear Stearns Entities; Defendant JPMORGAN Securities as successor-in-interest to BSC; Defendant EMC as successor-in-interest to EMC, and Defendant Chase successor liability for the wrongdoing of EMC and Defendant EMC.

**PLAINTIFF'S DISCOVERY OF THE "MATERIAL FACTS" AND THE EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS ON PLAINTIFF'A CAUSES OF ACTION**

*192.*   In 2011, Plaintiff first discovered that in 2005, in an effort to expand loan volume, Bear Stearns **knowingly and actively concealed** from investors, bond insurers, credit rating agencies, shareholders, and borrowers including Plaintiff, **"material facts"** that negatively impacted the value of the mortgages backing the securities it sold to investors between 2005 and 2007; namely, (i) the **"material fact"** that the mortgage valuation model used by Bear Stearns to assess the risk of the mortgages being originated and acquired for securitization in 2005 thru 2007 was deficient and outmoded because it failed to incorporate data about risk of default, and did not account for key factors such as changes in housing prices, and that the Bear Stearns Entities chose to use this outmoded and deficient model  in order to conceal the extremely high risk quality of the mortgages they were originating and acquiring for securitization; (ii) the **"material fact"** that  in 2005 thru 2007, a significant percentage of the nontraditional mortgages originated and acquired for securitization were "defective;" that is, a significant percentage of nontraditional mortgages  were not originated in compliance with the stated underwriting standards and guidelines of the Bear Stearns originators; and (iii) the **"material fact"** that in 2005 thru 2007, the Bear Stearns third party originators sold millions of defective

nontraditional mortgages to other securitizers, and as a consequence, Bear Stearns knew that a significant percentage of the nontraditional mortgages being sold originated would end in foreclosure by the end of 2008 (For a detailed description and explanation regarding the "material facts" see the section above entitled, *The Concealed Material Facts*).

193.    *Bear Stearns Deficient and Outmoded Mortgage Valuation Model*: The **"material facts"** concerning Bear Stearns deficient and outmoded mortgage valuation model was within Bear Stearns exclusive knowledge (note: Sec Regulators were precluded by law from revealing disclosures made by Bear Stearns in connection with the CSE program) and Bear Stearns  actively concealed its deficient and outmoded mortgage valuation model from Plaintiff, other borrowers, shareholders, credit rating agencies, bond insurers and investors.  It was not until this information was publically released in January of 2011 by the National Commission on the causes of the financial and economic crisis in a final report entitled: *The Financial Crisis Inquiry Report.*

194.    *Bear Stearns and the Defective Mortgages it Acquired:* The **"material fact"** that  in 2005 thru 2007, a significant percentage of the nontraditional mortgages originated and acquired by Bear Stearns for securitization were "defective;" that is, a significant percentage of

125

nontraditional mortgages were not originated in compliance with the stated underwriting standards and guidelines of the Bear Stearns originators was within Bear Stearns exclusive knowledge and Bear Stearns actively concealed these "material facts" from Plaintiff, other borrowers, shareholders, security regulators, credit rating agencies, bond insurers and investors. It was not until the following evidence was released that these "material facts" were made public; (1) The forensic testing conducted by experts employed by the FHFA as first revealed in the civil complaint filed by the FHFA on July 31, 2011 in the Fannie-Freddie case (supra); (ii) the forensic testing conducted by experts employed by Allstate Insurance as first revealed in the civil complaint filed by Allstate on February 16, 2011 in the Allstate case (supra); (iii) The forensic testing conducted by experts employed by Ambac Assurance Corporation as first revealed in the civil complaint filed by Ambac on February 17, 2011 in the Ambac case (supra); (iv) The forensic testing conducted by experts employed by Assured Guaranty Corporation as first revealed in the civil complaint filed by Assured on March 15, 2012 in the Assured case (supra); (v) The revelations of Clayton Holding concerning its due diligence regarding Bear Stearns for loans originated and acquired in 2005-2007 as first revealed in the

126

***Financial Crisis Inquiry Report*** published in January of 2011; and (vi) the "Early Payment Default" data and the "Bear Stearns Internal Audit Report" as first revealed in the civil complaints filed by Ambac on February 17, 2011  in the Ambac case (supra) and Assured Guaranty Corporation on March 15, 2012 in the Assured case (supra)..

195.   ***The Defective Mortgages Sold to other Securitizers:*** The **"material fact"** that in 2005 thru 2007, the Bear Stearns third party originators sold millions of defective nontraditional mortgages to other securitizers, and as a consequence, Bear Stearns knew that a significant percentage of the nontraditional mortgages being sold to other securitizers, like the loans Bear Stearns originated and acquired for its own securitizations, would end in foreclosure within a few years after origination. These **"material facts"** were within Bear Stearns exclusive knowledge and Bear Stearns actively concealed these "material facts" from Plaintiff, other borrowers, shareholders, security regulators, credit rating agencies, bond insurers and investors.  It was not until the following evidence was released that these "material facts" were made public: (i) the evidentiary matters set forth in paragraph 194 above, and (ii) the information provided by the FHFA on July 31, 2011 in the 16 additional cases filed as more fully described and explained in paragraphs 156 thru 161 above.

# FIRST CAUSE OF ACTION

## Violation of Sections 1572, 1709, and 1710

## of the California Civil Code Against All of the Defendants

196.   The preceding paragraphs and subsequent causes of action are hereby incorporated by reference as though fully set forth herein.

197.   This is a claim for fraudulent concealment and non disclosure for violation of Sections 1572, 1709, and 1710 of the California Civil Code against all Defendants.  The material facts are set forth below.

198.   In late February of 2006, Plaintiff entered into a contract to purchase a residential property located at 2149 Via Aguila, San Clemente California 92673 (the "purchase agreement"). The purchase price was $1,100,000 (the "purchase price") and the purchase was scheduled to close on May 15, 2006.

199.   The purchase agreement had an Appraisal Contingency and a Loan Contingency. Both contingencies had to be satisfied before Plaintiff became obligated to purchase the underlying property. The Appraisal Contingency required that the underlying property had to appraise for the purchase price. The Loan Contingency required that Plaintiff's lender provide financing equal to 90% of the purchase price. If either

128

contingency was not satisfied, Plaintiff had the right to cancel the purchase agreement, without penalty.

200.   In early March of 2006, Plaintiff engaged the services of CTX Mortgage. CTX Mortgage is a mortgage brokerage company which brings borrowers and lenders together for the purpose of loan origination; but does not originate or service the mortgages it brokers. As a mortgage broker, CTX was authorized to broker loans to many lenders including BSRM. CTX Mortgage's role was to select the appropriate mortgage lender, and submit Plaintiff's loan request to that lender for the purpose of providing financing that would enable Plaintiff to purchase the underlying property in accordance with the terms of the loan contingency set forth in the purchase agreement on the underlying property.

201.   CTX Mortgage subsequently informed Plaintiff of the following: (i) the lender selected by CTX Mortgage to originate Plaintiff's loan would require, as a condition to making the loan, that the underlying property appraise for the full amount of the purchase price (the "lenders appraisal contingency"); (ii) to assist the lender in determining the adequacy of the underlying property as security for its loan, the lender further required that an independent appraiser, pre-approved by the lender, conduct an appraisal on the underlying property; (iii) Plaintiff was required to pay

129

the costs of the appraisal; (iv) once the appraisal was completed, it would be submitted to the lender for its review and approval; (v) if the lender determined that the value of the underlying property was equal to the purchase price, the lender's appraisal contingency would be satisfied and the loan could fund provided all of the other lender conditions were satisfied; (vi) if the lender determined that the value of the underlying property was less than the purchase price, the Plaintiff could still borrow 90% of the appraised amount assuming that all of the other lender conditions were satisfied, and further assuming that Plaintiff was willing to proceed with the purchase under the terms of her purchase agreement. Plaintiff agreed to the above terms and paid for the costs of the appraisal.

202.   In early March of 2006, CTX Mortgage selected West Coast Appraisals to conduct the independent appraisal on the underlying property.

203.   In mid-April of 2006, Plaintiff was informed that CTX Mortgage selected BSRM as the lender to originate Plaintiff's loan request.

204.   In early May of 2006, CTX Mortgage informed Plaintiff that BSRM had adopted and approved the independent appraisal and as a result, BSRM was satisfied that the value of the underlying property was equal to the full amount of the purchase price.

205.   Plaintiff, in reliance on BSRM's representations, waived the Appraisal and Loan Contingencies in her purchase agreement, borrowed money from BSRM, and deposited into escrow the balance of funds needed to close the transaction. The transaction closed on May 15, 2006.

**206.**   Plaintiff alleges, in its First Cause of Action, the following: (i) Bear Stearns was engaged in a fraudulent business scheme designed to, *inter alia,* conceal "material facts" (as defined above) from borrowers in the preparation and review of their appraisals; (ii) BSRM in the preparation and review of Plaintiff's appraisal concealed the "material facts" from Plaintiff; (iii) BSRM concealed "material facts" with the intent to induce Plaintiff to borrow money and use the proceeds borrowed to purchase the underlying property; (iv) BSRM knew or believed the concealed "material facts" to be true, (v) BSRM was under a non-fiduciary duty to disclose the concealed material facts to Plaintiff; (vi) Plaintiff relied on BSRM's Representations; (vii) Plaintiff was justified in relying on BSRM's Representations; (vii) Plaintiff was unaware of the concealed material facts, and had Plaintiff known about the concealed material facts, Plaintiff would not have borrowed money from BSRM or purchased the underlying property; (viii) As a result of the concealment of material facts, Plaintiff suffered economic damages, and (ix) the

Defendants are liable for the actions of BSRM.  The above allegations are based on the following:

207.   ***Bear Stearns and the Fraudulent Business Scheme***: At the time of the origination of Plaintiff's two mortgage loans with BSRM, and for some time prior thereto, the Bear Stearns Entities, acting in concert with each other, and under the direction of BSI, aided and abetted each other in the implementation of a business scheme that consisted in pooling, securitizing, servicing and selling to investors, in the form of "mortgage-backed securities" ("MBS"), nontraditional mortgages originated by BSRM and its other originators.  However, in 2005, in an effort to expand loan volume, the Bear Stearns Entities, under the interest, ownership, direction and control of their parent corporation, BSI, conspired and agreed with each other to conceal from their investors, bond insurers, credit rating agencies, shareholders, SEC regulators, and borrowers including Plaintiff, certain "material facts" that negatively impacted the represented value, at origination, of the collateral supporting the loans of their originators.

208.   ***Bear Stearns  Concealment of Material Facts from Plaintiff***: As a borrower, the fraudulent business scheme impacted Plaintiff's in the following manner: In the preparation and review of the appraisal on the

132

underlying property, Bear Stearns  was in possession of "material facts" (more fully described and defined in the section entitled The Concealed Material Facts of this Third Amended Complaint) that negatively impacted the value and desirability of the underlying property. However, Bear Stearns, acting through BSRM (i) did not factor or take the "material facts" into account in the **preparation** of its appraisals including its appraisal on the underlying property, or (ii) did not factor or take the "material facts" into account in its **review** of the appraisal on the underlying property. Had BSRM taken the "material facts" into account in its preparation and review of the appraisal on the underlying property, BSRM would have been compelled as a conventional money lender to either (i) substantially lower the value given to the underlying property by the independent appraiser by an amount consistent with the risk of default and foreclosure reflected in the "material facts," or (ii) changed its underwriting standards and guidelines regarding loan-to-value ratios and required Plaintiff to substantially increase her equity investment into the underlying property by an amount consistent with the risk of default reflected in the "material facts," or (iii) simply disclosed the "material facts" to Plaintiff and its other borrowers.

209. **Bear Stearns Fraudulent Intent**: Thus by failing to take the material facts into account, Bear Stearns was able to maintain and expand its loan volume by fraudulently inducing prospective borrowers, like Plaintiff, to enter into a loan transaction under the false belief that the value of the homes they are financing are worth more than they were actually worth in the light of the "material facts."

210. *BSRM knew or believed the concealed material facts to be true.*

   A. Bear Stearns knew that it risk assessment mortgage valuation program was deficient and outmoded based on the factual allegations and assertions set forth in paragraphs 127 thru 138 of this Third Amended Complaint.

   B. Bear Stearns knew that its originators were systematically disregarding their own stated underwriting standards and guidelines (previously, "defective loans") based on the factual allegations and assertions set forth in paragraphs 139 thru 155 of this Third Amended Complaint.

   C. Bear Stearns knew that its third party originators were selling defective loans in substantial quantities to other securitizers based on the factual allegations and assertions set forth in paragraphs 156 thru 165 of this Third Amended Complaint.

D. Based on the above, Bear Stearns knew or believed the "material facts" to be true.

211. ***Bear Stearns Duty to disclose***: In the preparation and review of Plaintiff's appraisal, Bear Stearns was under a non-fiduciary duty to take into account the "material facts" as that term is referred to throughout this Third Amended Complaint because (i) Bear Stearns had exclusive knowledge of the concealed "material facts," and (iii) Bear Stearns actively concealed the material facts from Plaintiff, other borrowers, shareholders, security regulators, credit rating agencies, bond insurers and investors.

A. ***Exclusive Knowledge***: Bear Stearns knowledge of the concealed "material facts" was only known by or accessible to the Bear Stearns Entities. Plaintiff was unaware of these concealed material facts and knowledge of them was beyond the reach of Plaintiff by virtue of the fact that the Bear Stearns Entities were engaged in a fraudulent business scheme in which the concealment of the above referenced "material facts" was a prime objective of their fraudulent business scheme as the above is more fully described and explained throughout this Third Amended Complaint. .

**B. Active Concealment**: Bear Stearns not only concealed these material facts from Plaintiff but actively prevented Plaintiff from discovering the concealed material facts through independent investigation by actively concealing them from third parties who were legally entitled to have these material facts disclosed to them by the Bear Stearns Entities; namely, their shareholders, security regulators, credit rating agencies, bond insurers, investors, and prospective homebuyers including Plaintiff.  The manner and specific mechanisms used by the Bear Stearns Entities to actively conceal material facts from the above third parties is more fully described and explained throughout this Third Amended Complaint.

212.  **Plaintiff's Actual Reliance**: Plaintiff relied upon BSRM's representations of value (i) by not conducting an independent inquiry or investigation into the value of the property she was purchasing; (ii) by waiving the Appraisal Contingency contained in the Purchase Agreement, and (iii) by borrowing money from BSRM and using the proceeds to purchase the underlying property.

213.  **Justifiable Reliance**: Plaintiff was justified in relying on BSRM's representation of value concerning the underlying property without

conducting an independent inquiry or investigation into the value of the underlying property based on the following circumstances:

A. Plaintiff reasonably believed that BSRM was in the business of lending money to prospective residential homeowners and securing the money borrowed with one or more mortgages on the borrowers homes (the "collateral");

B. Plaintiff reasonably believed that BSRM prepared and reviewed appraisals on all of the homes it was requested to finance for the purpose of ascertaining the adequacy of the underlying collateral as security for its loans;

C. Plaintiff reasonably believed that to assist BSRM in ascertaining the value of the underlying property, BSRM obtained an appraisal from an independent appraiser that was in conformity with all federal, state and local rules and regulations.

D. Plaintiff reasonably believed that the independent appraisal was properly prepared and internally reviewed by BSRM, and that BSRM possessed the resources, knowledge, skill, expertise and experience to prepare and review appraisals for the purpose of ascertaining the adequacy of the underlying collateral as security for its loans;

137

E.  Plaintiff reasonably believed that in preparing the appraisal, BSRM provided the independent appraiser with all relevant and reliable information in its possession that could meaningfully impact the value of the underlying property in order (i) to enable the appraiser to factor such information into its appraisal of the underlying property, and (ii) to insure that the independent accurately ascertained the adequacy of the collateral as security for BSRM's loans.

F.  Plaintiff reasonably believed that in reviewing the appraisal, BSRM would factor all relevant and reliable information in their possession into the review of the appraisal that could meaningfully impact the opinion of the independent appraiser;

G.  Plaintiff reasonably believed that BSRM and the Plaintiff had a long term mutual economic interest and stake in the accuracy and integrity of the appraisal on the underlying property;

H.  Plaintiff reasonably believed that by relying on the representations of value made by BSRM, Plaintiff was following a long standing, customary and regularly accepted practice followed for many years by an overwhelmingly high percentage of California homebuyers. Under this customary practice, California homebuyers rely on their lender's representations of value in lieu of conducting an independent

138

investigation or inquiry into the value of the homes they are planning to purchase  largely because these California homebuyers have been led by real estate agents, mortgage brokers, mortgage lenders and their common sense into believing that mortgage lenders conduct appraisals for the purpose of determining the adequacy of the collateral used to secure their loans and not as part of a fraudulent business scheme to induce homebuyers into borrowing money to purchase a home (the "Customary Practice").

I.   Based on the above reasonable beliefs, Plaintiff was justified in relying on the representations of value made by BSRM concerning the underlying property.

**214.** *Damages*: As a direct and proximate result of the foregoing concealment of material facts by Defendants, and without limiting the damages described elsewhere in this Complaint, Plaintiff's damages arising from this cause of action, include all escrow fees, title fees, mortgage fees and other closing costs incurred in purchasing the underlying property; the down payment/equity invested to purchase the underlying property; all capital improvements made in remodeling and refurbishing the underlying property; all monthly mortgage payments including trial payments; all property taxes; all repairs, maintenance costs

139

and HOA fees paid, and damages for the negative impact Defendants wrongdoing had on Plaintiff's credit reports; all of which is in excess of $400,000..

215.  **Punitive Damages**: The wrongful conduct of Defendants, as alleged herein, including Defendants' placing of their corporate and/or individual profits over the rights of others, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well-being of Plaintiff, and other prospective home-buying borrowers similarly situated, and particularly vile, base, contemptible, and wretched. Such acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions. Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiffs and the general public. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants in an amount to deter them from similar conduct in the future.

216.  **Liability of Defendants**: Defendants are liable for the actions of BSRM and the other Bear Stearns Entities as more fully alleged in the

140

section of this Third Amended Complaint entitled: "Liability of the Bear Stearns Entities" set forth above.

217.   **WHEREFORE,** Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to actual damages, exemplary damages, unjust enrichment (legal restitution), prejudgment interest and costs.

## SECOND CAUSE OF ACTION

**Unlawful, Unfair and Fraudulent Business Practices in Violation of the California Business and Professions Code §§ 17200, et seq**

218.   Plaintiff brings this action individually, on her own behalf, pursuant to Cal. Bus. & Prof. Code § 17204.

219.   For the reasons described below, Defendants have engaged in unlawful, unfair and/or fraudulent business acts or practices in violation of California Business and Professions Code §17200, and by so engaging, Defendants, and each of them, have committed one or more acts of unfair competition within the meaning of California Business & Professions Code §§ 17200, *et seq.*  And Defendants misconduct caused Plaintiff substantial injury by, among other things, (i) causing her to lose equity in her home, and (ii) gave Defendants an unfair competitive advantage over competitors that did not engage in the same misconduct.

141

There were absolutely no countervailing benefits to consumers or to competition that could possibly outweigh this substantial injury, and this injury could not have been avoided or even discovered by the consumers, because it resulted from Defendants' failure to disclose and/or omission of material information that only the Defendants knew or should have known.

220.   ***Unfair Business Practices***: The misrepresentations and omissions of material facts by the Defendants as set forth herein, constitutes "unfair" business acts and practices within the meaning of California Business and Professions Code §§ 17200 *et seq.,* in that Defendants' omissions and misconduct as alleged in this action constitutes negligence and other tortious conduct involving Plaintiff and other members of the general public. ***Unlawful Business Practices*** The misrepresentations and omissions of material facts by the Defendants as set forth herein, constitutes "unlawful" business acts and practices within the meaning of California Business & Professions Code §§ 17200, *et seq.,* in that Defendants' unlawful business acts and/or practices as alleged herein have violated numerous laws and/or regulations federal and/or state, statutory and/or common law - and said predicate acts are therefore *per se* violations of §17200, *et seq.* These predicate unlawful business acts

142

and/or practices include, but are not limited to, the following: California Civil Code §§ 1572, 1709 and 1710  (Fraud and Deceit) and the common law tort of negligence.

221.   ***Fraudulent Business Practices*** The misrepresentations and omissions of material facts by the Defendants as set forth herein, constitutes "fraudulent" business acts and practices within the meaning of California Business and Professions Code §§ 17200 *et seq.,* in that the representations and concealment of material facts, as set forth herein, were false, misleading and/or likely to deceive the public within the meaning of California Business & Professions Code §§ 17200, *et seq.* These false representations and concealment of material facts as set forth herein were made with knowledge of its effect, and was done to induce Plaintiff and especially Californians (given the fact that a disproportionately high percentage of the nontraditional mortgages originated and acquired for securitization by Bear Stearns were originated in California) to borrow money from the Defendants and use the proceeds borrowed to purchase a home in the State of California. Plaintiff justifiably relied on Defendants misrepresentations when purchasing the underlying property. Had Plaintiff known that the Defendants representations were false, deceptive, misleading and likely

to deceive, Plaintiff would not have borrowed money from BSRM or purchased the underlying property.

222.   As a direct and proximate result of the aforementioned omissions, acts and practices, Defendants, and each of them, received monies and continue to hold the monies expended by Plaintiff.

223.   The named Defendants have thus engaged in unlawful, unfair and fraudulent business acts entitling Plaintiff to judgment and equitable relief against the Defendants, as more fully alleged in the Prayer for Relief.

224.   The unfair, deceptive and/or fraudulent business practices of Defendants, as fully described herein, present a continuing threat to members of the public to be misled and/or deceived by Defendants, as described herein. Plaintiff and other members of the general public have no other remedy of law that will prevent Defendants' misconduct as alleged herein from occurring and/or reoccurring in the future.

225.   ***Liability of Defendants***: Defendants are liable for the actions of BSRM and the other Bear Stearns Entities as more fully alleged in the section of this Initial Second Amended Complaint entitled: "Liability of the Bear Stearns Entities" set forth above.

226.   **WHEREFORE**, Plaintiffs is entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendants from Plaintiff because of their unfair, fraudulent, and deceptive acts and/or practices, attorney's fees and costs, declaratory relief, and a permanent injunction enjoining Defendants from engaging in their unfair, fraudulent and deceitful activity.

### THIRD CAUSE OF ACTION
### Negligence as to all of the Defendants

227.   Bear Stearns owed a duty of care to Plaintiff; Bear Stearns breached that duty and the breach was the actual and proximate cause of the injury suffered by Plaintiff.

228.   ***Duty of Care***: Bear Stearns, acting through BSRM, owed an explicit duty of care to Plaintiff in preparing and reviewing the appraisal of the underlying property because BSRM's involvement in the loan transaction exceeded the scope of its conventional role as a mere lender of money. Bear Stearns owed an implicit duty of due care to Plaintiff in preparing and reviewing the appraisal on the underlying property based on the balancing of the following factor: (i) the intent of the transaction; (ii) the foreseeability of harm to the Plaintiff; (iii) the certainty of injury; (iv) Defendants' conduct and Plaintiff's injury; (v) the proper assignment of moral blame; and (vi) the policy of preventing future harm.

145

**A.  *Bear Stearns Explicit Duty of Due Care***: In the preparation and review of the appraisal on the underlying property, Bear Stearns was in possession of "material facts" that negatively impacted the value and desirability of the underlying property. However, Bear Stearns, acting through BSRM (i) did not factor or take the "material facts" into account in the **preparation** of its appraisals including its appraisal on the underlying property, (ii) nor did it factor or take the "material facts" into account in its **review** of the appraisal on the underlying property. Had BSRM taken the "material facts" into account in its preparation and review of the appraisal on the underlying property, BSRM would have, as a conventional money lender conducting appraisals to determine the adequacy and sufficiency of the collateral to support a loan, been compelled to either (i) substantially lower the value given to the underlying property by the independent appraiser by an amount consistent with the risk of default and foreclosure reflected in the "material facts," or (ii) change its underwriting standards and guidelines regarding loan-to-value ratios and require borrowers, like Plaintiff, to substantially increase their equity investment into the underlying property by an amount consistent with the risk of default reflected in the "material facts," or

146

(iii) simply disclosed the "material facts" to borrowers, including the Plaintiff. Thus by failing to take the material facts into account, Bear Stearns was able to maintain and expand its loan volume but at the cost of converting the appraisal process from one in which the lender conducts the appraisal to determine the adequacy and sufficiency of the collateral to support a loan, into a process in which the appraisal itself becomes an instrument to induce prospective borrowers, like Plaintiff, to enter into a loan transaction under the false belief that the value of the homes they are financing are worth more than they were actually worth in the light of the "material facts."

**B. *Bear Stearns Implicit Duty of Due Care: Balancing the Factors***

   *(i)      The Intent of the Transaction*: As previously noted, the purpose of BSRM's preparation and review of the appraisal on the underlying property was not to protect BSRM's interest in satisfying itself that the underlying property provided adequate security for Plaintiff's loan because BSRM and the other Bear Stearns Entities had material facts in their possession that negatively impacted the value of the underlying property and these material facts were concealed from Plaintiff and not factored into the preparation and review of the appraisal. The

147

material facts were concealed with the intent (i) to assure Plaintiff that the underlying property was sound and (ii) to induce Plaintiff to enter into the loan transaction and purchase the underlying property. Had BSRM and the other Bear Stearns entities disclosed these material facts to Plaintiff or factored them into the preparation and review of the appraisal, Plaintiff would not have borrowed money and used the funds borrowed to purchase the underlying property because the value of the underlying property would have been significantly less than the representation of value by BSRM, or BSRM would have required Plaintiff to invest more equity than Plaintiff was willing to invest. Thus, by failing to factor the concealed "material facts" into the preparation  and review of the appraisal, Defendants manifested their intent to affect Plaintiff in a manner dictating the existence of a duty of care owed to the Plaintiff. .

(ii)     ***Foreseeability of Harm to Plaintiff:*** The foreseeability of harm to Plaintiff was immediate.  Plaintiff was in no position to know what  Bear Stearns knew; namely, that BSRM and the other Bear Stearns Entities were actively participating in a

148

fraudulent business scheme designed to conceal from borrowers including Plaintiff, the negative impact on the value and desirability of the property Plaintiff was purchasing.  Nor did Plaintiff have the means available to discover the high risk quality of the mortgage loans being originated by BSRM. As previously stated, what made these loans high-risk was that (i) Bear Stearns knowingly employed a  modeling program that was deficient and outmoded; (ii) the fact that the Bear Stearns knowingly purchased defective loans from originators who also sold millions of defective loans to other securitizers; and (iii) given the above, the risk of default and foreclosure was so high that it was a virtual certainty that within a matter of a few years after origination, a substantial percentage of these mortgages would default and be foreclosed upon and sold **in such large numbers** that the aggregate effect of these sales created a substantial probability that the housing market would be overwhelmed with more homes than could be sold at current price levels, causing home prices to decline substantially below the amounts owed on these mortgages at the time of their origination. These facts were known to BSRM and the other

149

Bear Stearns Entities. Plaintiff did not have access to this information and Plaintiff was prevented from discovering this information by the Bear Stearns Entities fraudulent business scheme which was designed to actively conceal the high-risk quality of the nontraditional mortgages acquired for securitization from everyone they were legally obligated to disclose this information to, namely, credit rating agencies, bond insurers, investors, shareholders, security regulators and borrowers including the Plaintiff.  Furthermore, it was reasonably foreseeable that a borrower such as Plaintiff would rely upon BSRM appraisal in the good faith belief that it was prepared and reviewed in order to ascertain the adequacy and sufficiency of the collateral to support BSRM's loan to Plaintiff, and not for the purpose of inducing prospective homebuyers such as Plaintiff to borrow money and use the money borrowed to purchase a home.

(iii)    ***Certainty of Injury***: Had Bear Stearns exercised due care in preparing and reviewing the appraisal, it would have taken into account the "material facts" that negatively impacted the value and desirability of the underlying property. And had Bear

150

Stearns taken the "material facts" into account, the appraisal on the underlying property would have been lowered to an amount consistent with the risk of default and foreclosure reflected in the "material facts," or Bear Stearns – for its own safety – would have required Plaintiff to increase its equity investment into the property by an amount consistent with the risk of default and foreclosure reflected in the "material facts,". And had Plaintiff known that the property was valued at an amount less than the purchase price, or Plaintiff was required to increase the amount of equity investment in the property in order to obtain financing, she would have elected to exercise her right of cancellation without penalty under the purchase agreement, and consequently, not borrow money from BSRM or any other lender to purchase the underlying property. As a consequence of BSRM and the other Bear Stearns Entities failure to exercise due care, plaintiff's injuries were certain to follow.

(iv)    ***Bear Stearns Conduct and Plaintiff's Injury***: As previously discussed, the connection between Bear Stearns conduct and the injury Plaintiff suffered is certain because the appraisal was

151

intended to induce Plaintiff into borrowing money and using the money to purchase the underlying property, and not to assure Bear Stearns that its collateral – the underlying property – was adequate security for Plaintiff's loan.

*(v)*    ***Moral Blame***: There is moral blame to be attached to Bear Stearns  conduct because the Plaintiff was not in a position to protect against loss.

*(vi)*    ***Policy of Preventing Future Harm***: Under California case law, there is a strong public policy to prevent imposition on a lender of a duty of care in the preparation and review of an appraisal that is done solely for the lender's benefit; i.e., for the purpose of determining the adequacy and sufficiency of the collateral to support a loan. However, there is an equally strong, counter-public policy reflected in the same California case law, that imposes on a lender a duty of care  in the preparation and review of an appraisal where the facts show, as alleged herein, that the appraisal of the underlying property was not prepared and reviewed to protect the lender's interest, but was intended to assure Plaintiff that the underlying property was sound and to induce Plaintiff to enter into the loan transaction and purchase

the underlying property. In the counter-public policy context, as alleged here, Bear Stearns owed a duty of care to Plaintiff to take the "material facts" into account in the preparation and review of the appraisal on the underlying property because it was not conducted for the benefit of the lender, and the imposition of this counter-public policy is reinforced where a lender, such as BSRM, engages in this practice for all of its prospective homebuyers.

**C. *Breach of Duty***: Bear Stearns was under a duty to Plaintiff to exercise reasonable care in the preparation and review of the appraisal on the underlying property by taking into account "material facts" that negatively impacted the value and desirability of the underlying. By failing to take the "material facts" in account in the preparation and review of the appraisal on Plaintiff's property, Bear Stearns breached its duty of care it owed to Plaintiff. :

**D. Actual Cause**: Bear Stearns failure to disclose the concealed material facts to Plaintiff or to factor the concealed material facts into the preparation and review of its appraisal of the underlying property, caused Plaintiff to borrow money from BSRM and use the proceeds borrowed to purchase the underlying property. Had BSRM disclosed

153

the concealed material facts to Plaintiff or factored the concealed

material facts into the preparation and review of the appraisal of the

underlying property, Plaintiff would not have borrowed money from

BSRM or purchased the underlying property.

E. **Proximate Cause**: The injury complained of by Plaintiff was the

consequence of Bear Stearns failure to take into account in its

preparation and review of the appraisal on the underlying property

"material facts" that negatively impacted the value and desirability of

the property. As a natural and proximate consequence, Plaintiff

purchased the underlying property and used the monies borrowed to

finance the purchase. These consequences would have reasonably

been foreseen by a person of ordinary intelligence in the light of

attending circumstances.

F. *Damages*: As a direct and proximate result of the foregoing

concealment of material facts by Defendants, and without limiting the

damages described elsewhere in this Complaint, Plaintiff's damages

arising from this cause of action, include all escrow fees, title fees,

mortgage fees and other closing costs incurred in purchasing the

underlying property; the down payment/equity invested to purchase

the underlying property; all capital improvements made in remodeling

154

and refurbishing the underlying property; all monthly mortgage payments including trial payments; all property taxes; all repairs, maintenance costs and HOA fees paid, and damages for the negative impact Defendants  wrongdoing had on Plaintiff's credit reports; all of which is in excess of $400,000..

**G. *Liability of Defendants***: Defendants are liable for the actions of BSRM and the other Bear Stearns Entities as more fully alleged in the section of this Third Amended Complaint entitled: "Liability of the Bear Stearns Entities" set forth above.

**H. *WHEREFORE*,** Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to actual damages, exemplary damages, unjust enrichment (legal restitution), prejudgment interest and costs.

## PRAYER FOR RELIEF

**WHEREFORE,** prays for judgment against each Defendant, jointly and severally, as follows:

For actual damages according to proof;

For compensatory damages as permitted by law;

For statutory damages as permitted by law;

For punitive damages as permitted by law;

For unjust enrichment and/or legal restitution;

For rescission of the Plaintiff's two mortgage loans;

155

For equitable relief, including restitution;

For restitutionary disgorgement of all profits Defendants obtained as a result of their unfair competition;

For interest as permitted by law;

For reasonable attorneys' fees and costs as permitted by law; and

For such other relief as is just and proper.

George Spizzirri

georgespizzirri@cox.net

Attorney for Plaintiff

Bar number 277865

806 E Avendia Pico, Ste-I #313

San Clemente CA 92673

Tel: 949-218-4765

Fax: 949-218-6737

156

## PROOF OF SERVICE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### Santa Ana Division

George H. Spizzirri, being first duly sworn, deposes and says:

1.  George H. Spizzirri is the attorney for the Plaintiff in the above-entitled action.

2.  George H. Spizzirri is not a party to this action.

3.  On July 27, 2012, affiant deposited in a post office regularly maintained by the United States Postal Service at San Clemente CA 92673, a copy of the Third Amended Complaint to be delivered by United States Mail, first class postage prepaid, return receipt requested, to Natasha S. Ahmed, of the Law Firm of Wargo and French, attorney for all of the defendants in the above entitled action, at the following address: 1888 Century Park East, Suite 1520, Los Angeles, CA 90067.

Executed on July 27, 2012 at San Clemente CA

By: _____

George H. Spizzirri, Attorney for Plaintiff

157

# PROOF OF SERVICE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 1888 Century Park East, Suite 1520, Los Angeles, California 90067.

On August 30, 2012, I served the foregoing document(s) described as **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT PURSUANT TO FRCP 12B(6); MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties to this action by delivering a copy thereof in a sealed envelope addressed to each of said interested parties at the following address(es): SEE ATTACHED LIST

☐   **(BY MAIL)** I am readily familiar with the business practice for collection and processing of correspondence for mailing with the United States Postal Service. This correspondence shall be deposited with the United States Postal Service this same day in the ordinary course of business at our Firm's office address in Los Angeles, California.  Service made pursuant to this paragraph, upon motion of a party served, shall be presumed invalid if the postal cancellation date of postage meter date on the envelope is more than one day after the date of deposit for mailing contained in this affidavit.

☒   **(BY ELECTRONIC SERVICE)** by causing the foregoing document(s) to be electronically filed using the Court's Electronic Filing System which constitutes service of the filed document(s) on the individual(s) listed on the attached mailing list.

☒   (Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury that the above is true and correct.

Executed on August 30, 2012 at Los Angeles, California.

*/s/ Jeff Williams*
Jeffrey N. Williams

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300

1

**SERVICE LIST**

2

3

George Spizzirri
806 E. Avenida Pico, Ste I-313
San Clemente, CA 92673
*Attorney for Plaintiff*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Offices
**Wargo & French LLP**
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Phone: 310-853-6300